**ARROW OFFICE SUPPLY CO.,**
a Michigan Corporation,
Plaintiff,

v.

**CITY OF DETROIT, a Municipal Corporation, and Oreese Collins, Jr., Purchasing Director for the City of Detroit,[1] Defendants.**

Civ. A. No. 91–CV–76357–DT.

United States District Court,
E.D. Michigan, S.D.

July 7, 1993.

---

**1.** Defendant Collins was previously dismissed from the lawsuit.

Robert C. Zack, Carol A. Morris, Southfield, MI, for plaintiff.

Ulysses W. Boykin, Lewis, White and Clay, P.C., Harold D. Pope, Detroit, MI, for defendants.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

Plaintiff, a former office supply contractor to the Defendant City of Detroit, has sued to invalidate Ordinance 559–H[2], a set-aside ordinance which the Detroit City Council enacted in July of 1983 and amended in February, 1984, because enforcement of that ordinance deprives Plaintiff of its rights under the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States[3] and under 42 U.S.C. § 1983.[4]

This case is now before the Court on the parties' cross-motions for partial summary judgment, and for the reasons outlined below this Court must grant the Plaintiff's motion for a judgment of liability. There is no genuine issue of any material fact which would require trial, and Plaintiff is entitled to judgment as a matter of law.

Ordinance 559–H created the Sheltered Market Programs in 1983. This Ordinance requires Defendant City, each fiscal year, to award 20 percent of the total dollar volume of all contracts awarded the prior fiscal year to entities designated as sheltered market participants. The stated goal of the Sheltered Market Program is to award at least 40 percent of the total dollar volume of all City contracts each year under the Sheltered Market Program and the Minority Business Enterprise ("MBE") subcontractor utilization program.[5]

Prior to enacting the Ordinance initially, the City Council held public hearings on February 28, 1983, March 14, 1983, and March 28, 1983, during which a number of witnesses were heard, most of whom were business leaders in the black community. Many of the witnesses testified to the difficulties they had encountered in the business world in general, and in doing business with the City in particular, due to circumstances which they felt had been caused by past discrimination. They cited the great difficulty of obtaining credit, the red tape of the numerous papers to be filed for a city contract, bonding problems, the lack of the resources necessary to compete, including training in public contracting procedures, access to capital, equipment or an established reputation.

An MBE, or Minority Business Enterprise, was originally defined by the Council in the first enactment of this Ordinance as a business unit which is beneficially owned by minority persons and in which minority persons occupy the majority of management and board positions and control all decisions. Testimony had been taken as to the statistical disparity between the percentage of contracts awarded to MBEs by the City and the black population of the City. All testimony concerning discrimination had concerned blacks. The Ordinance, accordingly, was

---

2. City of Detroit Code, Article V, Division 2. "Sheltered Market Programs and Minority Business Enterprise Subcontractor Utilization Program", §§ 18–5–31—18–5–49.

3. No State shall ... deny to any person within its jurisdiction the equal protection of the laws.

4. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the or

immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered a statute of the District of Columbia.

5. Any contracts awarded to minorities without benefit of the Sheltered Market and MBE subcontractor utilization programs are not to be counted toward achieving this goal.

originally enacted to define minorities as including only black persons.

After the July, 1983 enactment of H–559, the City Council took additional testimony on November 1, 1983, at the apparent request of other racial and ethnic groups, including Native Americans, Hispanics, and Asian Americans, as well as women. They testified that they, too, suffered the disadvantages of discriminatory exclusion in the Detroit business community, and were considered to be "minorities" by other governmental units, such as the United States Department of Defense, the Environmental Protection Agency, the Michigan Minority Purchasing Council, the United States Hispanic Chamber of Commerce, and Wayne County, Michigan. The initial ordinance was therefore amended by Ordinance No. 578–H on February 3, 1984. The definition of minorities was therein expanded to include Hispanics, Asian Americans, and Native Americans, as well as blacks.

The Court has been provided transcripts of those hearings and after careful study finds that, as Plaintiff has argued, they are barren of direct evidence of race or sex discrimination on the part of the City in letting contracts. They are, rather, a record of all of the manifold difficulties encountered by a young business, whether small, black, female, or merely inexperienced in gaining entry to an established market. They fully reflect, moreover, the sorry history of the societal discrimination which the black businessman has long endured.

The record before the Council indicates that, on February 28, 1983, the Director of the City's Human Rights Department, Agnes Bryant, presented a written report on "Minority Companies Contracting with the City of Detroit." She testified that in 1970, the now extinct Commission on Community Relations began keeping records on the number of minority [6] companies contracting with the City each year and the dollar volume of those contracts. Only 38 of the 1,397 companies contracting with the City in 1970 were headed by minorities. Based upon those statistics, the Commission had recommended shortly thereafter that the City:

1. Take affirmative action to encourage minority business participation in its contractual process; and

2. Establish an Office for Minority Business Enterprise charged with the responsibility for coordinating the development of a comprehensive municipal policy and program to ensure that minority businesses secure contracts with the City.

The Commission had suggested that the proposed MBE Office 1) make information regarding the City bidding process available to the minority business community; 2) possibly modify and simplify the bidding procedures; 3) promote the use of minority firms in every phase of City purchasing, construction, and service contracts; 4) develop and coordinate a means of fully notifying the minority business community of opportunities to bid on all City contracts; and 5) devise workable alternatives to bonding requirements so as to not unduly restrict minority contractors' bidding ability.

Then, in 1973, Detroit voters elected their first black Mayor and adopted a new Charter which created the Human Rights Department to replace the Commission on Community Relations. The Bryant Report indicates that the number of minorities contracting with the City rose that year to 168 (or 7.4 percent of the total number of contractors). The dollar volume of these contracts totalled $16,046,252 (or 11 percent of the total contract dollar value). And by that time the City had a 50 percent minority population.

Yet in 1974, according to the Bryant Report, awards to minority contractors decreased to 126 companies (5.9 percent) and a volume of $10,663,945. In 1975, less than half that number of minorities received contracts with the City, or 53 companies (2.6 percent) totalling $8,503,377.

Minority contracting statistics fluctuated the next few years, rising slightly in 1976 when 78 companies (5.1 percent) received $9,400,000 in contracts. They dropped to 3.5 percent in 1977 and went back up to 5.8 percent in 1978. At that point, Ms. Bryant's Human Rights Department began to insist

**6.** The Report used "minority" synonymously with "black."

that all City departments seek out and include minority contractors in the letting and awarding of City contracts.

In 1979, the City Council enacted the Omnibus Human Rights Ordinance, 303–H, amended by 330–H. At the same time, the Environmental Protection Agency and the Detroit Water Department established a fifteen percent set-aside for minority contractors on EPA-funded contracts. Unfortunately, the Bryant Report notes, although the set-aside was intended to encourage the incorporation and growth of minority enterprises, it "has often had the opposite effect in the overnight formation of minority front businesses by majority business enterprises. More thorough investigation is needed of all newly or recently-incorporated businesses in order to determine their legitimacy as minority companies."

The Omnibus Human Rights Ordinance was declared unconstitutional in 1981 when a state court permanently enjoined the Human Rights Department from its enforcement. The dollar volume of minority contracts, however, went up from 5.9 percent in 1980–81 to 12.1 percent in 1981–82.

The record before the Council in 1983 included not only the historical Bryant Report, but also the statistical and extrapolative testimony and written report of Dr. Barbara Price, an Economics professor at Wayne State University. Although Dr. Price noted that 12 percent of the City's contracts had been awarded to minorities [7] in the previous fiscal year, she appears to have been totally unaware of the City records upon which the Bryant Report was based, and after concluding that no records on the subject were available, devised a formula to ascertain the extent of minority participation from 1968 to 1982, in City contracts.

Dr. Price chose a sample set of 105 files from the Purchasing Department, from all of the bid and advertised purchases of $5,000.00 or more of the City of Detroit, between 1968 and 1982. The record does not disclose the total number of files, or purchases, from which the sample of 105 was selected, or how the samples were chosen. Of the 105 files

chosen, however, she ascertained that only two, or 1.9 percent, included bids from enterprises which were also listed in the minority business directories which were utilized by Dr. Price to identify black businesses. The study concluded that minorities had not bid on any City contracts whatsoever before 1974, and that only 3 percent of all contract awards since 1974 had been to minority businesses. The 3 percent of minority awards was then compared to the 1970 and 1980 United States Census estimates that the population of the City of Detroit was 44 percent black in 1970 and 63 percent black in 1980. Dr. Price's testimony was that this disparity (between 3% contractors and 63% population) could not have occurred statistically, without the intervention of invidious racial discrimination. Therefore, the Report concluded that the City had been guilty of prior race discrimination and remedial action was required. It was upon this Price Report that the Council based the necessity of the Ordinance.

The Ordinance states the findings which were made by the Council, after the above-described hearings, which included:

1. That through 1974, the City's intentional discrimination had resulted in no awards of contracts to any MBE;

2. That, since 1974, MBEs continue to suffer present consequences of past discrimination, to the extent that only 3 percent of the City contracts were awarded to MBEs; and

3. That the City, with a minority population over 66 percent, has a compelling public interest in eradicating all vestiges of discrimination against MBEs.

Those findings appear to have been based entirely upon the Price Report's sample study, which bore absolutely no relation to the factual report of Director Agnes Bryant, based upon City records compiled since 1970. No findings whatsoever were made or evidence taken concerning women, for whom the Ordinance created a separate "Woman-Owned Business Sheltered Market Program" in the Finance Department, for which a goal of at least 5 percent of the prior years' total

---

**7.** The report did not provide a definition of "minorities."

contract volume is also set aside. Any contracts awarded to MBEs or outside the Sheltered Market Program are not counted toward achieving the goals. The findings of fact upon which these programs are posited completely contradict the only factual evidence received, in the substance of the totally disregarded Bryant Report. Purchasing has been made in accordance with the Ordinance since 1983.

Plaintiff had contracted with the City to furnish office supplies for a number of years prior to the instant dispute, and the last such contract was effective to May 31, 1990 with two one-year renewal options; one of which was exercised to May 31, 1991. On May 19, 1991, the City refused to exercise the final one-year renewal option. At that time, the contract was shifted to the Sheltered Market Program and Plaintiff, which is not a minority enterprise, became ineligible to bid.

In July, 1991, Plaintiff appealed to the Detroit City Council, which referred the question to the Legal Department and requested that the Purchasing Director meet with Plaintiff to resolve the matter. Council members noted that Plaintiff had satisfactorily serviced the City for a number of years and urged the Purchasing Director to renew the contract. He refused, however, either to meet with Plaintiff or to renew the contract. Plaintiff then initiated this action because it was not allowed to bid on a City of Detroit contract.

 Plaintiff contends that Ordinance 559–H's Sheltered Market Program discriminates on the basis of race and violates the constitutional right of equal protection because it impinges upon Plaintiff's right to contract with the City on the basis of race. Unfortunately, however well-intentioned the City's efforts have been in this regard, Ordinance 559–H must be held unlawfully discriminatory and unconstitutional, under the well-settled law since at least 1989.

This ordinance was adopted shortly after a Judge of this District had upheld the State of Michigan's contract set-aside program in *Michigan Road Builders Ass'n, Inc. v. Milliken*, 654 F.Supp. 3 (E.D.Mich.1986), but before the Sixth Circuit had reversed that Judge's decision in 1987. A major sea change has occurred in the law governing affirmative action and set-asides since 1983, of which the City has, apparently, been unaware. It is necessary, therefore, to review the historical setting of these events.

As Judge Krupansky explained in *Michigan Road Builders Ass'n, Inc. v. Milliken*, 834 F.2d 583 (6th Cir.1987), aff'd, 489 U.S. 1061, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989), the Supreme Court held in *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 305, 98 S.Ct. 2733, 2756, 57 L.Ed.2d 750 (1978) (plurality opinion):

> When a classification denies an individual opportunities or benefits enjoyed by others solely because of his race or ethnic background, it must be regarded as suspect.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> We have held that "in order to justify the use of a suspect classification, a State must show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is 'necessary to the accomplishment' of its purpose or the safeguarding of its interest."

834 F.2d at 586 (citations omitted).

Three years later, in *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), the Supreme Court examined a Congressionally enacted set-aside program in public works. It found that "Congress had abundant evidence from which it could conclude that minority businesses have been denied effective participation in public contracting opportunities by procurement practices that perpetuated the effects of prior discrimination." *Id.* at 477–78, 100 S.Ct. at 2774.

The Court further held that the Congressional racial classifications of *Fullilove* met the most stringent level of review, or the strictest level of scrutiny, and that set-aside provisions must be " 'narrowly tailored to the achievement of [the] goal' of ameliorating the effects of that past discrimination." 834 F.2d at 587, *citing* 448 U.S. at 480, 100 S.Ct. at 2776.

Judge Krupansky also noted in reversing this District's *Michigan Road Builders* deci-

sion (upon which the City appears to have relied, for this Ordinance), that after *Bakke* and *Fullilove,* the Sixth Circuit began to relax and redefine the term "strict scrutiny" as it applied in affirmative action cases. In *Bratton v. City of Detroit,* 704 F.2d 878, 886–87 (6th Cir.1983) (citation omitted), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984), the Sixth Circuit had written that:

> It is uncontested that the government has a *significant interest* in ameliorating the disabling effects of identified discrimination.
>
> * * * * * *
>
> Once the governmental interest in some remedial action is thus established, we must proceed to determine whether the remedial measures employed are *reasonable.*

(Emphasis supplied).

Again, in *Michigan Road Builders,* the Sixth Circuit wrote that its relaxed standard had not required that a " 'direct showing of past intentional discrimination' by the governmental unit imposing the affirmative action plan was necessary; and required that the plan need only be a 'reasonable' means of serving the governmental interest of eradicating the effects of past discrimination," 834 F.2d at 587, *citing Detroit Police Officers' Ass'n v. Young,* 608 F.2d 671, 694 (6th Cir. 1979), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981).

This Circuit's relaxed standard was once again stated in *Ohio Contractors Ass'n v. Keip,* 713 F.2d 167, 175 (6th Cir.1983), in which the Sixth Circuit held that, where the compelling interest of ameliorating the effects of its past discrimination was clear, the affirmative action plan need only be "reasonably calculated" to serve that interest.

That trend in this Circuit was drawn to a sharp halt in 1986 when, in *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), the Supreme Court reversed the Sixth Circuit's application of its more relaxed standard of review of an affirmative action plan. In reversing *Wygant,* the Court wrote that "[r]acial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." *Id.* at 273, 106 S.Ct. at 1846, *quoting Bakke,* 438 U.S. at 291, 98 S.Ct. at 2749 (opinion of Powell, J., joined by White, J.). The Court then cited *Fullilove* for the necessity of determining that racial or ethnic preferences do not conflict with constitutional guarantees, and provided two prongs for that examination:

> First, any racial classification "must be justified by a compelling governmental interest." Second, the means chosen by the State to effectuate its purpose ·must be "narrowly tailored to the achievement of that goal."

*Id.,* 476 U.S. at 274, 106 S.Ct. at 1847. (Citations omitted). This was a clear statement that the court would tolerate no lower standards for benign remedies of past discrimination than for the initial invidious discrimination, itself.

One year later in *Michigan Road Builders,* Judge Krupansky wrote that "[t]he Supreme Court left no doubt that the standard of judicial review previously employed by this circuit in racial and ethnic affirmative action cases was inappropriate." 834 F.2d at 588.

Unfortunately, the district court in *Michigan Road Builders,* upon which the Detroit City Council relied for this Ordinance, had utilized the more relaxed standard of our circuit, and had expressly refused to require the state to present a "compelling" interest; instead requiring only the demonstration of a "significant" government interest in ameliorating the effects of past discrimination. Moreover, the district court had not required a showing of narrowly tailored means, but only that the actions taken were "a reasonable means of achieving that end."

So the long and short of this history is that the standard which the Sixth Circuit was applying to affirmative action plans in 1983, when this Ordinance was enacted, was reversed by the Supreme Court in 1986, in *Wygant.* The district court opinion to which several witnesses before the Detroit City Council alluded as authority for this program during hearings on this Ordinance was then reversed by the Sixth Circuit in 1987, for

failure to meet the strict scrutiny required by the Supreme Court.

That scrutiny, according to the teachings of *Wygant* and *U.S. v. Paradise*, 480 U.S. 149, 167, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987), acknowledges that the state "unquestionably has a compelling interest" in remedying its own past and present discrimination. The remedial action, however, must be preceded by "a finding based upon material factual evidence, that it has in the past discriminated against those classes it now favors." *Michigan Road Builders*, 834 F.2d at 589.

> [The Supreme Court] "never has held that societal discrimination alone is sufficient to justify a racial classification. Rather, the Court has insisted upon some showing of prior discrimination *by the governmental unit involved* before allowing limited use of racial classifications in order to remedy such discrimination."
>
> * * * * * *
>
> In particular, [a state] must ensure that, before it embarks on an affirmative action [sic] program, it has convincing evidence that remedial action is warranted.

*Id.* at 589–90 (emphasis in original), *quoting Wygant*, 476 U.S. at 274, 277, 106 S.Ct. at 1847, 1848.

■ It is only after judicial, legislative, or administrative findings of constitutional or statutory violations have been made that the governmental interest in preferring members of the injured groups at the expense of others becomes *substantial,* in order to vindicate the legal rights of the victims. *Bakke*, 438 U.S. at 307, 98 S.Ct. at 2759. "Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy." *Wygant*, 476 U.S. at 276, 106 S.Ct. at 1848.

The Supreme Court explained that before a governmental body can assert that a racial preference is "compelling":

> [T]here must be findings of prior discrimination. Findings of *societal* discrimination will not suffice; the findings must concern the "prior discrimination *by the government unit involved.*"

*Michigan Road Builders*, 834 F.2d at 590 (citations omitted) (emphasis in original).

So, to decide *Michigan Road Builders,* the Sixth Circuit had to "decide whether the Michigan legislature, based upon the evidentiary factual record before it, 'had a firm basis for believing that such action was required based on prior discrimination' by the state itself." *Id., citing J.A. Croson Co. v. City of Richmond,* 822 F.2d 1355, 1360 (4th Cir.1987), *aff'd,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). Then, the Sixth Circuit examined evidence assertedly relied upon by the Defendants as the firm basis upon which the legislature had acted, and found that the state had failed to develop material evidence to support a compelling interest in adopting the racial and ethnic distinctions made.

The evidence included "conclusory historical resumes of unrelated legislative enactments and proposed enactments, executive reports, a state funded private study," public hearings, and questionnaires sent to small and minority businesses which evoked complaints of, as it did here: complexity of procurement procedures; excessively slow receipt of payments; bonding problems; inadequacy of information from the government; the contracts were too large; there was no requirement for large contractors to solicit bids from small and minority subcontractors; excessive pre-award costs and bonding costs; financing problems; lack of capital; and the inability to buy or sell in volume. Most of these problems were noted to be the disadvantages of *size* which a small business faces in an occupied market.

So, although the evidence was that businesses controlled by minorities and women had received a share of state contracts disproportionately smaller than their presence in the population (as in this case), and although it is the undisputed fact that they have been systematically denied equal opportunity in this society, there was no evidence of prior invidious discrimination by the state itself.

The Sixth Circuit also wrote with disapproval of the statistical study upon which the *Michigan Road Builders* Defendants relied, based upon a sampling of state purchase

contracts which was inordinately small, because the state agencies had not maintained records on minority procurement. There was testimony, too, that although minorities comprised 13.73 percent of state population, they were only 5 percent of the businesses within the state. Comparisons between the percentage of the state population and the percentage who have gained entry into a specialized group with narrow qualifications are, of course, always inapposite.

Accordingly, the Sixth Circuit found that the state failed to demonstrate a compelling governmental interest in establishing the racial and ethnic classifications, and that the classifications were, therefore, constitutionally invalid.

*J.A. Croson v. City of Richmond,* which was decided in 1989, is the most instructive recent Supreme Court statement of its position on minority set-asides. In *Croson,* the Court held that a minority set-aside ordinance of the City of Richmond violated the Equal Protection Clause and distinguished it from the one upheld in *Fullilove,* noting that a municipal set-aside program may not be judged by "the treatment of an exercise of congressional power in *Fullilove* ...." *Croson,* 488 U.S. at 491, 109 S.Ct. at 720. In his concurring opinion in *Fullilove,* Justice Powell made it clear that other lesser governmental entities will be judged more stringently in the enactment of set-sides than will be Congress, which acts with the authority of a branch of government. 448 U.S. at 515–16, 100 S.Ct. at 2793–94. States and their political subdivisions are not free to decide what remedies are appropriate to redress the effects of society-wide discrimination. *Croson,* 488 U.S. at 490, 109 S.Ct. at 720. "Section 1 of the Fourteenth Amendment is an explicit *constraint* on state power, and the States must undertake any remedial efforts in accordance within that provision." *Id.* (Emphasis in original).

The instant set-aside, like Richmond's, does not allow certain citizens the opportunity to compete for a fixed percentage of public contracts solely because of their race. Nor has this City demonstrated more than Richmond did, that it had become even a "passive participant" in direct discrimination against minority contractors. Unless race-based classifications "are strictly reserved for remedial settings, they may in fact ... lead to a politics of racial hostility." *Id.* at 493, 109 S.Ct. at 722. "[A] generalized assertion that there has been past discrimination ... provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Id.* at 498, 109 S.Ct. at 724. "[T]he sorry history of ... public discrimination in this country ... standing alone, cannot justify a rigid racial quota in the awarding of public contracts ...." *Id.* at 499, 109 S.Ct. at 725. Here, the City merely proffers "inherently unmeasurable claims of past wrongs" without providing probative evidence that remedial action was necessary, and is also unable to justify the racial quota in the Sheltered Market Program. *Id.* at 506, 109 S.Ct. at 728.

Further, the Supreme Court in *Croson* noted that it could not even validate the ordinance by hypothesizing, as courts once did, that a more relaxed type of scrutiny was appropriate "when 'the white majority' places burdens upon itself." 488 U.S. at 495, 109 S.Ct. at 722. The evidence presented in *support* of upholding the set-aside had revealed that, in the City of Richmond, blacks then comprised approximately 50 percent of the population and that 5 of the 9 City Council seats were held by blacks. Similarly, in Detroit, the 1980 United States Census revealed that the City was 63 percent black. Five of the 9 seats on the City Council enacting this Ordinance were held by blacks, including that of City Council President. Accordingly, the Supreme Court noted the concern that a political majority would act to the disadvantage of a minority, in both cases, "would seem to militate for, not against, the application of heightened judicial scrutiny ...." *Id.* at 496, 109 S.Ct. at 723. *Croson* cited Ely, The Constitutionality of Reverse Racial Discrimination, 41 U.Chi.L.Rev. 723, 739 n. 58 (1974) ("Of course it works both ways: a law that favors Blacks over Whites would be suspect if it were enacted by a predominantly Black legislature.") *Id.* at 496, 109 S.Ct. at 723. Most telling to this Court, however, is that the Ordinance was enacted without any direct evidence whatso-

ever that the City was guilty of any single instance of racial discrimination against a candidate for a city contract. Neither is any instance recorded of discrimination against Native Americans, Hispanics, or Asians, although the long history of societal discrimination against them in this country cannot be gainsaid.

Moreover, the "statistical" study done for the City by Dr. Price, which purports to compare the number of estimated minority contractors with the number of blacks in the population, is unpersuasive on, several bases. First, it is factually contradicted by the Agnes Bryant records. Second, it is statistically infirm because of the small sample taken (on an unknown basis) of a vast group of undisclosed size. Third, as *Croson* and all prior cases discussing use of statistical comparisons have held, a comparison between total population and persons chosen for possession of specific skills or qualifications is inapposite. The number of minority city contractors might properly have been compared with the number of minority businesses in the area offering the business for which the City sought contracts. Those figures, however, appear nowhere in this record.

With regard to women, the less stringent standard that there are "important governmental objectives" and means "substantially related" may be applied. *Michigan Road Builders*, 834 F.2d at 595, *citing Wengler v. Druggist Mut. Ins. Co.*, 446 U.S. 142, 150, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107 (1980). This is a level of "intermediate scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988). But in this case, even that lower standard could not "withstand constitutional attack since evidence of record that the [City] discriminated against women [was] nonexistent." *Michigan Road Builders*, 834 F.2d at 595. Therefore, the Sixth Circuit found that the law which authorized the setting-aside of state contracts for minority and women business enterprises constitutionally invalid and the set-aside for women is no less invalid in this case.

Therefore, having found that the City had no "compelling interest" to support the racial and gender-based classifications in its set-

aside programs, on the settled law since at least 1989, this Court need not advance to the second prong of the equal protection analysis to determine whether the Sheltered Market Program was "narrowly tailored." The Court has no choice but to hold that this City's Shelter Market Program is unconstitutional and "that the city has failed to demonstrate a compelling interest in apportioning public contracting opportunities on the basis of race" to the detriment of this Plaintiff, in 1990. *Croson*, 488 U.S. at 505, 109 S.Ct. at 728.

The witnesses at the City Council's hearings testified as to difficulties encountered as to past societal discrimination which, as noted by Judge Krupansky in *Michigan Road Builders*, are those which "most MBEs [face] *as a result of their size.*" 834 F.2d at 592 (emphasis in original). None of the evidence presented was of direct intentional invidious discrimination by the City of Detroit. The statistical study was not only improperly done, but contradicted by the Bryant Report's facts.

Plaintiff, a contractor which does not qualify as either an MBE or a WBE, has not been permitted to bid on contracts with the City for the past two years. As the Supreme Court pointed out in *Croson*, the Sheltered Market Program is "problematic from an equal protection standpoint because [it makes] the color of an applicant's skin the sole relevant consideration." 488 U.S. at 508, 109 S.Ct. at 729. The Court agreed with the view expressed by Justice Powell in *Bakke*, that "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color." *Id.* at 494, 109 S.Ct. at 722, *quoting Bakke*, 438 U.S. at 289–90, 98 S.Ct. at 2748.

Because the evidence presented to the Detroit City Council and before this Court does not withstand "strict judicial scrutiny," or even the "substantially related" standard for women, the City of Detroit's Sheltered Market Program cannot be distinguished from simple invidious discrimination, and its race-based treatment of a non-minority contractor such as Plaintiff in 1991, violates the dictates

of the Equal Protection Clause of the United States Constitution.

Accordingly, Ordinance 559–H is held to be unconstitutional, and Plaintiff's motion for partial summary judgment is GRANTED. A hearing will be set on the question of damages to which Plaintiff, under *Croson,* is entitled.

**IT IS SO ORDERED.**