# Legal Guidance on the Implications of the Supreme Court's Decision in *Adarand Constructors, Inc. v. Peña*

This memorandum sets forth preliminary legal guidance on the implications of the Supreme Court's decision in *Adarand Constructors, Inc. v. Peña*, which held that "strict scrutiny" is the standard that governs judicial review of the constitutionality of federal affirmative action programs that use racial and ethnic criteria as a basis for decisionmaking. The memorandum is not intended to serve as a definitive statement of what *Adarand* means for any particular affirmative action program; rather, it is intended to provide a general overview of the Court's decision and the application of the strict scrutiny standard in the context of affirmative action.

June 28, 1995

MEMORANDUM OPINION TO GENERAL COUNSELS

This memorandum sets forth preliminary legal guidance on the implications of the Supreme Court's recent decision in *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995), which held that federal affirmative action programs that use racial and ethnic criteria as a basis for decisionmaking are subject to strict judicial scrutiny. The memorandum is not intended to serve as a definitive statement of what *Adarand* means for any particular affirmative action program. Nor does it consider the prudential and policy questions relevant to responding to *Adarand.* Rather, it is intended to provide a general overview of the Court's decision and the new standard for assessing the constitutionality of federal affirmative action programs.

Our conclusions can be briefly summarized. *Adarand* made applicable to federal affirmative action programs the same standard of review, strict scrutiny, that *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989), applied to state and local affirmative action measures — with the important caveat that, in this area, Congress may be entitled to greater deference than state and local governments. Although *Adarand* itself involved contracting, its holding is not confined to that context; rather, it is clear that strict scrutiny will now be applied by the courts in reviewing the federal government's use of race-based criteria in health, education, hiring, and other programs as well.

The Supreme Court in *Adarand* was careful to dispel any suggestion that it was implicitly holding unconstitutional all federal affirmative action measures employing racial or ethnic classifications. A majority of the Justices rejected the proposition that "strict scrutiny" of affirmative action measures means "strict in theory, fatal in fact," and agreed that "[t]he unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country" may justify the use of race-based remedial measures in certain circumstances. 515 U.S. at 237. *See id.* at 268 (Souter, J., dissenting); *id.* at 273 (Ginsburg, J., dissenting). Only two Justices advocated positions that approach a complete ban on affirmative action.

171

The Court's decision leaves many questions open — including the constitutionality of the very program at issue in the case. The Court did not discuss in detail the two requirements of strict scrutiny: the governmental interest underlying an affirmative action measure must be "compelling" and the measure must be "narrowly tailored" to serve that interest. As a consequence, our analysis of *Adarand's* effects on federal action must be based on *Croson* and the lower court decisions applying strict scrutiny to state and local programs. It is unclear, however, what differences will emerge in the application of strict scrutiny to affirmative action by the national government; in particular, the Court expressly left open the question of what deference the judiciary should give to determinations by Congress that affirmative action is necessary to remedy discrimination against racial and ethnic minority groups. Unlike state and local governments, Congress may be able to rely on national findings of discrimination to justify remedial racial and ethnic classifications; it may not have to base such measures on evidence of discrimination in every geographic locale or sector of the economy that is affected. On the other hand, as with state and local governments under *Croson*, Congress may not predicate race-based remedial measures on generalized, historical societal discrimination.

Two additional questions merit mention at the outset. First, the Court has not resolved whether a governmental institution must have sufficient evidence of discrimination to establish a compelling interest in engaging in race-based remedial action *before* it takes such action. A number of courts of appeals have considered this question in reviewing state and local affirmative action plans after *Croson*, and all have concluded that governments may rely on "post-enactment" evidence — that is, evidence that the government did not consider when adopting the measure, but that reflects evidence of discrimination providing support for the government's determination that remedial action was warranted at the time of adoption. Those courts have said that the government must have had some evidence of discrimination when instituting an affirmative action measure, but that it need not marshal all the supporting evidence at that time. Second, while *Adarand* makes clear that remedying past discrimination will in some circumstances constitute a compelling interest sufficient to justify race-based measures, the Court did not address the constitutionality of programs aimed at advancing nonremedial objectives — such as promoting diversity and inclusion. For example, under Justice Powell's controlling opinion in *Regents of the Univ. of Calif. v. Bakke*, 438 U.S. 265 (1978), increasing the racial and ethnic diversity of the student body at a university constitutes a compelling interest, because it enriches the academic experience on campus. Under strict scrutiny, it is uncertain whether and in what settings diversity is a permissible goal of affirmative action beyond the higher education context. To the extent that affirmative action is used to foster racial and ethnic diversity, the government must seek some further objective beyond the achievement of diversity itself.

Our discussion in this memorandum proceeds in four steps. In Section I, we analyze the facts and holding of *Adarand* itself, the scope of what the Court did decide, and the questions it left unanswered. Section II addresses the strict scrutiny standards as applied to state and local programs in *Croson* and subsequent lower court decisions; we consider the details of both the compelling interest and the narrow tailoring requirements *Croson* mandated. In Section III, we turn to the difficult question of how precisely the *Croson* standards should apply to federal programs, with a focus on the degree of deference courts may give to congressional determinations that affirmative action is warranted. Finally, in an appendix, we sketch out a series of questions that should be considered in analyzing the validity under *Adarand* of federal affirmative action programs that employ race or ethnicity as a criterion. The appendix is intended to guide agencies as they begin that process.

## I. *The Adarand Case*

### A. *Facts*

*Adarand* involved a constitutional challenge to a Department of Transportation ("DOT") program that compensates persons who receive prime government contracts if they hire subcontractors certified as small businesses controlled by "socially and economically disadvantaged" individuals. The legislation on which the DOT program is based, the Small Business Act, establishes a government-wide goal for participation of such concerns at "not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year." 15 U.S.C. § 644(g)(1). The Act further provides that members of designated racial and ethnic minority groups are presumed to be socially disadvantaged. *Id.* § 637(a)(5), § 637(d)(2),(3); 13 C.F.R. § 124.105(b)(1).[1] The presumption is rebuttable. 13 C.F.R. §§ 124.111(c)-(d), 124.601–124.609.[2]

In *Adarand*, a nonminority firm submitted the low bid on a DOT subcontract. However, the prime contractor awarded the subcontract to a minority-owned firm that was presumed to be socially disadvantaged; thus, the prime contractor received additional compensation from DOT. 515 U.S. at 205. The nonminority firm sued DOT, arguing that it was denied the subcontract because of a racial classification, in violation of the equal protection component of the Fifth Amend-

---

[1] The following groups are entitled to the presumption: African American; Hispanic; Asian Pacific; Subcontinent Asian; and Native American. *See Adarand*, 515 U.S. at 205. This list of eligible groups parallels that of many federal affirmative action programs.

[2] DOT also uses the subcontractor compensation mechanism in implementing the Surface Transportation and Uniform Relocation Assistance Act of 1987 ("STURAA"), Pub. L. No. 100–17, § 106(c)(1), 101 Stat. 145, and its successor, the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"), Pub. L. No. 102–240, § 1003(b), 105 Stat. 1919–22. Both laws provide that "not less than 10 percent" of funds appropriated thereunder "shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals." STURAA and ISTEA adopt the Small Business Act's definition of "socially and economically disadvantaged individual," including the applicable race-based presumptions. *Adarand*, 515 U.S. at 208.

ment's Due Process Clause. The district court granted summary judgment for DOT. The Court of Appeals for the Tenth Circuit affirmed, holding that DOT's race-based action satisfied the requirements of "intermediate scrutiny," which it determined was the applicable standard of review under the Supreme Court's rulings in *Metro Broad., Inc. v. FCC,* 497 U.S. 547 (1990), and *Fullilove v. Klutznick,* 448 U.S. 448 (1980). *See Adarand,* 515 U.S. at 210.

## B. *The Holding*

By a five-four vote, in an opinion written by Justice O'Connor, the Supreme Court held in *Adarand* that strict scrutiny is now the standard of constitutional review for federal affirmative action programs that use racial or ethnic classifications as the basis for decisionmaking. The Court made clear that this standard applies to programs that are mandated by Congress, as well as those undertaken by government agencies on their own accord. 515 U.S. at 227. The Court overruled *Metro Broadcasting* to the extent that it had prescribed a more lenient standard of review for federal affirmative action measures. *Id.*[3]

Under strict scrutiny, a racial or ethnic classification must serve a "compelling interest" and must be "narrowly tailored" to serve that interest. *Id.*[4] This is the same standard of review that, under the Supreme Court's decision in *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469 (1989), applies to affirmative action measures adopted by state and local governments. It is also the same standard of review that applies to government classifications that facially discriminate against minorities. *Adarand,* 515 U.S. at 221–24.

In a portion of her opinion joined by Chief Justice Rehnquist, Justice Kennedy, and Justice Thomas, Justice O'Connor sought to "dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact' " when it comes to affirmative action. *Id.* at 237 (quoting *Fullilove,* 448 U.S. at 519 (Marshall, J., concurring in the judgment)). While that familiar maxim doubtless remains true with respect to classifications that, on their face, single out racial and ethnic minorities for invidious treatment,[5] Justice O'Connor's opinion declared that the federal government may have a compelling interest to act on the basis of race to overcome the "persistence of both the practice and lingering effects of racial discrimination against minority groups in this country." *Id.* In this respect, Justice O'Connor's opinion in *Adarand* tracks her majority opinion in *Croson.* There, too, the Court

---

[3] Justice O'Connor (along with three other Justices) had dissented in *Metro Broadcasting* and urged the adoption of strict scrutiny as the standard of review for federal affirmative action measures.

[4] A classification reviewed under intermediate scrutiny need only (i) serve an "important" governmental interest and (ii) be "substantially related" to the achievement of that objective. *Metro Broad.,* 497 U.S. at 564–65.

[5] *See, e.g., McLaughlin v. Florida,* 379 U.S. 184, 192 (1964) (racial and ethnic classifications that single out minorities for disfavored treatment are in almost all circumstances "irrelevant to any constitutionally acceptable legislative purpose") (internal quotations omitted); *Loving v. Virginia,* 388 U.S. 1, 11 (1967) ("There is patently no legitimate overriding purpose independent of invidious racial discrimination which justifies" state law that prohibited interracial marriages).

declined to interpret the Constitution as imposing a flat ban on affirmative action by state and local governments. 488 U.S. at 509–11.

Two members of the *Adarand* majority, Justices Scalia and Thomas, wrote separate concurring opinions in which they took a more stringent position. Consistent with his concurring opinion in *Croson*, Justice Scalia would have adopted a near-absolute constitutional bar to affirmative action. Taking issue with Justice O'Connor's proposition that racial classifications may be employed in certain circumstances to remedy discrimination against minorities, Justice Scalia stated that the "government can never have a 'compelling interest' in discriminating on the basis of race in order to 'make-up' for past racial discrimination in the opposite direction." *Adarand*, 515 U.S. at 239 (Scalia, J., concurring in part and concurring in the judgment).[6] According to Justice Scalia, "[i]ndividuals who have been wronged by unlawful racial discrimination should be made whole; but under our Constitution there can be no such thing as either a creditor or a debtor race. That concept is alien to the Constitution's focus on the individual . . . ." *Id.* The compensation of victims of specific instances of discrimination through "make-whole" relief, which Justice Scalia accepts as legitimate, is not affirmative action, as that term is generally understood. Affirmative action is a group-based remedy: where a group has been subject to discrimination, individual members of the group can benefit from the remedy, even if they have not proved that they have been discriminated against personally.[7] Justice O'Connor's treatment of affirmative action in *Adarand* is consistent with this understanding.

Although Justice Thomas joined the portion of Justice O'Connor's opinion holding that the government's interest in redressing the effects of discrimination can be sufficiently compelling to warrant the use of remedial racial and ethnic classifications, he apparently agrees with Justice Scalia's rejection of the group-based approach to remedying discrimination. Justice Thomas stated that the "government may not make distinctions on the basis of race," and that it is "irrelevant whether a government's racial classifications are drawn by those who wish to oppress a race or by those who have a sincere desire to help those thought to be disadvantaged." *Id.* at 240 (Thomas, J., concurring in part and concurring in the judgment).

---

[6] In his *Croson* concurrence, Justice Scalia said that he believes that "there is only one circumstance in which the States may act *by race* to 'undo the effects of past discrimination': where that is necessary to eliminate their own maintenance of a system of unlawful racial classification." 488 U.S. at 524 (Scalia, J., concurring in the judgment). For Justice Scalia, "[t]his distinction explains [the Supreme Court's] school desegregation cases, in which [it has] made plain that States and localities sometimes have an obligation to adopt race-conscious remedies." *Id.* The school desegregation cases are generally not thought of as affirmative action cases, however. Outside of that context, Justice Scalia indicated that he believes that "[a]t least where state or local action is at issue, only a social emergency rising to the level of imminent danger to life and limb . . . can justify an exception to the principle embodied in the Fourteenth Amendment that our Constitution is color-blind." *Id.* at 521.

[7] *See Local 28, Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 482 (1986); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277–78 (1986) (plurality opinion), *id.* at 287 (O'Connor, J., concurring).

The four dissenting Justices in *Adarand* (Justices Stevens, Souter, Ginsburg, and Breyer)[8] would have reaffirmed the intermediate scrutiny standard of review for congressionally authorized affirmative action measures established in *Metro Broadcasting*, and would have sustained the DOT program on the basis of *Fullilove*, where the Court upheld federal legislation requiring grantees to use at least ten percent of certain grants for public works projects to procure goods and services from minority businesses. Justices Stevens and Souter argued that the DOT program was more narrowly tailored than the legislation upheld in *Fullilove*. *Adarand*, 515 U.S. at 259–64 (Stevens, J., dissenting); *id.* at 266–67 (Souter. J., dissenting). All four dissenters stressed that there is a constitutional distinction between racial and ethnic classifications that are designed to aid minorities and classifications that discriminate against them. As Justice Stevens put it, there is a difference between a "No Trespassing" sign and a "welcome mat." *Id.* at 245 (Stevens, J., dissenting). *See id.* ("[a]n attempt by the majority to exclude members of a minority race from a regulated market is fundamentally different from a [race-based] subsidy that enables a relatively small group of [minorities] to enter that market"); *see also id.* at 270 (Souter, J., dissenting); *id.* at 275–76 (Ginsburg, J., dissenting). For the dissenters, Justice O'Connor's declaration that strict scrutiny of affirmative action programs is not "fatal in fact" signified a "common understanding" among a majority of the Court that those differences do exist, and that affirmative action may be entirely proper in some cases. *Id.* at 271, 275 (Ginsburg, J., dissenting). In Justice Ginsburg's words, the "divisions" among the Justices in *Adarand* "should not obscure the Court's recognition of the persistence of racial inequality and a majority's acknowledgment of Congress' authority to act affirmatively, not only to end discrimination, but also to counteract discrimination's lingering effects." *Id.* at 273. The dissenters also emphasized that there is a "significant difference between a decision by the Congress of the United States to adopt an affirmative-action program and such a decision by a State or a municipality." *Id.* at 249 (Stevens, J., dissenting); *id.* at 264 (Souter, J., dissenting). They stressed that unlike state and local governments, Congress enjoys express constitutional power to remedy discrimination against minorities; therefore, it has more latitude to engage in affirmative action than do state and local governments. *Id.* at 255 (Stevens, J., dissenting). Justice Souter noted that the majority opinion did not necessarily imply a contrary view. *Id.* at 268–69 (Souter, J., dissenting).

Thus, there were at most two votes in *Adarand* (Justices Scalia and Thomas) for anything that approaches a blanket prohibition on race-conscious affirmative action. Seven justices confirmed that federal affirmative action programs that use

---

[8] Justice Stevens wrote a dissenting opinion that was joined by Justice Ginsburg. Justice Souter wrote a dissenting opinion that was joined by Justices Ginsburg and Breyer. And Justice Ginsburg wrote a dissenting opinion that was joined by Justice Breyer.

race or ethnicity as a decisional factor can be legally sustained under certain circumstances.

## C. *Scope of Adarand*

Although *Adarand* involved government contracting, it is clear from the Supreme Court's decision that the strict scrutiny standard of review applies whenever the federal government voluntarily adopts a racial or ethnic classification as a basis for decisionmaking.[9] Thus, the impact of the decision is not confined to contracting, but will reach race-based affirmative action in health and education programs, and in federal employment.[10] Furthermore, *Adarand* was not a "quota" case: its standards will apply to any classification that makes race or ethnicity a basis for decisionmaking.[11] Mere outreach and recruitment efforts, however, typically should not be subject to the *Adarand* standards. Indeed, post-*Croson* cases indicate that such efforts are considered race-neutral means of increasing minority opportunity.[12] In some sense, of course, the targeting of minorities through outreach and recruitment campaigns involves race-conscious action. But the objective there is to expand the pool of applicants or bidders to include minorities, not to use race or ethnicity in the actual decision. If the government does not use racial or ethnic classifications in selecting persons from the expanded pool, *Adarand* ordinarily would be inapplicable.[13]

*Adarand* does not require strict scrutiny review for programs benefitting Native Americans as members of federally recognized Indian tribes. In *Morton v. Mancari*, 417 U.S. 535 (1974), the Supreme Court applied rational basis review

[9] By voluntary affirmative action, we mean racial or ethnic classifications that the federal government adopts on its own initiative, through legislation, regulations, or internal agency procedures. This should be contrasted with affirmative action that is undertaken pursuant to a court-ordered remedial directive in a race discrimination lawsuit against the government, or pursuant to a court-approved consent decree settling such a suit. Prior to *Croson*, the Supreme Court had not definitely resolved the standard of review for court-ordered or court-approved affirmative action. *See United States v. Paradise*, 480 U.S. 149 (1987) (court order); *Local 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501 (1986) (consent decree) The Court has not revisited the issue since *Croson* was decided. Lower courts have applied strict scrutiny to affirmative action measures in consent decrees. *See, e.g., Stuart v. Roache*, 951 F.2d 446, 449 (1st Cir. 1991) (Breyer, J.) *cert. denied*, 504 U.S. 913 (1992).

[10] Title VII of the 1964 Civil Rights Act is the principal federal employment discrimination statute. The federal government is subject to its strictures. *See* 42 U.S.C. § 2000e–17. The Supreme Court has held that the Title VII restrictions on affirmative action in the workplace are somewhat more lenient than the constitutional limitations. *See Johnson v. Transportation Agency*, 480 U.S. 616, 627–28 n.6 (1987). *But see id.* at 649 (O'Connor, J., concurring in the judgment) (expressing view that Title VII standards for affirmative action should be "no different" from constitutional standards).

[11] We do not believe that *Adarand* calls into question federal assistance to historically-black colleges and universities.

[12] *See, e.g., Peightal v. Metropolitan Dade County*, 26 F.3d 1545, 1557–58 (11th Cir. 1994); *Billish v. City of Chicago*, 962 F.2d 1269, 1290 (7th Cir. 1992), vacated on other grounds, 989 F.2d 890 (7th Cir.) (en banc), *cert. denied*, 510 U.S. 908 (1993); *Coral Constr. Co. v. King County*, 941 F.2d 910, 923 (9th Cir. 1991), *cert. denied*, 502 U.S. 1033 (1992).

[13] Outreach and recruitment efforts conceivably could be viewed as race-based decisionmaking of the type subject to *Adarand* if such efforts work to create a "minorities-only" pool of applicants or bidders, or if they are so focused on minorities that nonminorities are placed at a significant competitive disadvantage with respect to access to contracts, grants, or jobs.

177

to a hiring preference in the Bureau of Indian Affairs for members of federally recognized Indian tribes. The Court reasoned that a tribal classification is "political rather than racial in nature," because it is "granted to Indians not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities." *Id.* at 554. *See id.* at 553 n.24.

*Adarand* did not address the appropriate constitutional standard of review for affirmative action programs that use gender classifications as a basis for decision-making. Indeed, the Supreme Court has never resolved the matter.[14] However, both before and after *Croson*, nearly all circuit court decisions have applied intermediate scrutiny to affirmative action measures that benefit women.[15] The Sixth Circuit is the only court that has equated racial and gender classifications: purporting to rely on *Croson*, it held that gender-based affirmative action measures are subject to strict scrutiny.[16] That holding has been criticized by other courts of appeals, which have correctly pointed out that *Croson* does not speak to the appropriate standard of review for such measures.[17]

## D. *Open Questions on Remand*

*Adarand* did not determine the constitutionality of any particular federal affirmative action program. In fact, the Supreme Court did not determine the validity of the federal legislation, regulations, or program at issue in *Adarand* itself. Instead, the Court remanded the case to the Tenth Circuit for a determination of whether the measures satisfy strict scrutiny.

*Adarand* left open the possibility that, even under strict scrutiny, programs statutorily prescribed by Congress may be entitled to greater deference than programs adopted by state and local governments. This is a theme that some of the Justices had explored in prior cases. For example, in a portion of her *Croson* opinion joined by Chief Justice Rehnquist and Justice White, Justice O'Connor wrote that Congress may have more latitude than state and local governments in utilizing affirmative action. And in his concurrence in *Fullilove*, Justice Powell, applying strict scrutiny, upheld a congressionally mandated program, and in so doing, said that he was mindful that Congress possesses broad powers to remedy discrimination nationwide. In any event, in *Adarand*, the Court said that it did not have

---

[14] The lone gender-based affirmative action case that the Supreme Court has decided is *Johnson v. Transportation Agency*, 480 U.S. 616 (1987). But *Johnson* only involved a Title VII challenge to the use of gender classifications — no constitutional claim was brought. *Id.* at 620 n.2. And as indicated above (*see supra* note 10), the Court in *Johnson* held that the Title VII parameters of affirmative action are not coextensive with those of the Constitution.

[15] *See, e.g., Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1579–80 (11th Cir. 1994); *Contractors Ass'n v. City of Philadelphia*, 6 F.3d 990, 1009–10 (3d Cir. 1993); *Lamprecht v. FCC*, 958 F.2d 382, 391 (D.C. Cir. 1992) (Thomas, J.); *Coral Constr. Co. v. King County*, 941 F.2d at 930–31; *Associated Gen. Contractors v. City and County of San Francisco*, 813 F.2d 922, 939 (9th Cir. 1987).

[16] *See Conlin v. Blanchard*, 890 F.2d 811, 816 (6th Cir. 1989); *see also Brunet v. City of Columbus*, 1 F.3d 390, 404 (6th Cir. 1993), *cert. denied*, 510 U.S. 1164 (1994).

[17] *See, e.g., Seibels*, 31 F.3d at 1580.

to resolve whether and to what extent courts should pay special deference to Congress in evaluating federal affirmative action programs under strict scrutiny.

Aside from articulating the components of the strict scrutiny standard, the Court's decision in *Adarand* provides little explanation of how the standard should be applied. For more guidance, one needs to look to *Croson* and lower court decisions applying it. That exercise is important because *Adarand* basically extends the *Croson* rules of affirmative action to the federal level — with the caveat that application of those rules might be somewhat less stringent where affirmative action is undertaken pursuant to congressional mandate.

## II. *The Croson Standards*

In *Croson*, the Supreme Court considered a constitutional challenge to a Richmond, Virginia ordinance that required prime contractors who received city contracts to subcontract at least thirty percent of the dollar amount of those contracts to businesses owned and controlled by members of specified racial and ethnic minority groups — commonly known as minority business enterprises ("MBEs"). The asserted purpose of Richmond's ordinance was to remedy discrimination against minorities in the local construction industry.

*Croson* marked the first time that a majority of the Supreme Court held that race-based affirmative action measures are subject to strict scrutiny.[18] Justice O'Connor's opinion in *Croson*[19] said that "the purpose of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." 488 U.S. at 493 (plurality opinion). *See also id.* at 520 (Scalia, J., concurring in the judgment) ("'[S]trict scrutiny must be applied to all governmental classifications by race, whether or not its asserted purpose is 'remedial' or 'benign.''"). In short, the compelling interest inquiry centers on "ends" and asks *why* the government is classifying individuals on the basis of race or ethnicity; the narrow tailoring inquiry focuses on "means" and asks *how* the government is seeking to meet the objective of the racial or ethnic classification.

Applying strict scrutiny, the Court held that (a) the Richmond MBE program did not serve a "compelling interest" because it was predicated on insufficient

---

[18] *Croson* was decided by a six-three vote. Five of the Justices in the majority (Chief Justice Rehnquist, and Justices White, O'Connor, Scalia, and Kennedy) concluded that strict scrutiny was the applicable standard of review. Justice Stevens concurred in part and concurred in the judgment, but consistent with his long-standing views, declined to "engag[e] in a debate over the proper standard of review to apply in affirmative-action litigation." 488 U.S. at 514 (Stevens, concurring in part and concurring in the judgment).

[19] Justice O'Connor's opinion was for a majority of the Court in some parts, and for a plurality in others.

evidence of discrimination in the local construction industry, and (b) it was not "narrowly tailored" to the achievement of the city's remedial objective.

## A. *Compelling Governmental Interest*

### 1. *Remedial Objectives*

Justice O'Connor's opinion in *Croson* stated that remedying the identified effects of past discrimination may constitute a compelling interest that can support the use by a governmental institution of a racial or ethnic classification. This discrimination could fall into two categories. First, the government can seek to remedy the effects of its own discrimination. Second, the government can seek to remedy the effects of discrimination committed by private actors within its jurisdiction, where the government becomes a "passive participant" in that conduct, and thus helps to perpetuate a system of exclusion. 488 U.S. at 492 (plurality opinion); *id.* at 519 (Kennedy, J., concurring in part and concurring in the judgment). In either category, the remedy may be aimed at ongoing patterns and practices of exclusion, or at the lingering effects of prior discriminatory conduct that has ceased. *See Adarand*, 515 U.S. at 269 (Souter, J., dissenting) ("The Court has long accepted the view that constitutional authority to remedy past discrimination is not limited to the power to forbid its continuation, but extends to eliminating those effects that would otherwise persist and skew the operation of public systems even in the absence of current intent to practice any discrimination.").

*Croson* requires the government to identify with precision the discrimination to be remedied. The fact and legacy of general, historical societal discrimination is an insufficient predicate for affirmative action: "While there is no doubt that the sorry history of both private and public discrimination in this country has contributed to a lack of opportunities for black entrepreneurs, this observation, standing alone, cannot justify a rigid racial quota in the awarding of public contracts in Richmond, Virginia." 488 U.S. at 499. *See id.* at 505 ("To accept Richmond's claim that past societal discrimination alone can serve as the basis for rigid racial preferences would be to open the door to competing claims for 'remedial relief' for every disadvantaged group."). Similarly, "amorphous" claims of discrimination in certain sectors and industries are inadequate. *Id.* at 499 ("[A]n amorphous claim that there has been past discrimination in a particular industry cannot justify the use of an unyielding racial quota."). Such claims "provide[ ] no guidance for [the government] to determine the precise scope of the injury it seeks to remedy," and would have "no logical stopping point." *Id.* at 498 (internal quotations omitted). The Court indicated that its requirement that the government identify with specificity the effects of past discrimination anchors remedial affirmative action measures in the present. It declared that "[i]n the absence of particularized findings" of discrimination, racial and ethnic classifica-

tions could be "ageless in their reach into the past, and timeless in their ability to affect the future." *Id.* (internal quotations omitted).

The Court in *Croson* did not require a judicial determination of discrimination in order for a state or local government to adopt remedial racial or ethnic classifications. Rather, relying on Justice Powell's plurality opinion in *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267 (1986), the Court said that the government must have a " 'strong basis in evidence for its conclusion that remedial action was necessary.' " *Croson*, 488 U.S. at 500 (quoting *Wygant*, 476 U.S. at 277). The Court then suggested that this evidence should approach "a prima facie case of a constitutional or statutory violation" of the rights of minorities. 488 U.S. at 500.[20] Notably, the Court said that significant statistical disparities between the level of minority participation in a particular field and the percentage of qualified minorities in the applicable pool could permit an inference of discrimination that would support the use of racial and ethnic classifications intended to correct those disparities. *Id.* at 507. *See id.* at 501 ("There is no doubt that where gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination.") (internal quotations omitted). But the Court said that a mere underrepresentation of minorities in a particular sector or industry when compared to general population statistics is an insufficient predicate for affirmative action. *Id.* ("When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who may possess the necessary qualifications) may have little probative value.") (internal quotations omitted).

Applying its "strong basis in evidence" test, the Court held that the statistics on which Richmond based its MBE program were not probative of discrimination in contracting by the city or local contractors, but at best reflected evidence of general societal discrimination. Richmond had relied on limited testimonial evidence of discrimination, supplemented by statistical evidence regarding: (i) the disparity between the number of prime contracts awarded by the city to minorities during the years 1978–1983 (less than one percent) and the city's minority population (fifty percent), and (ii) the extremely low number of MBEs that were members of local contractors' trade associations. The Court found that this evidence was insufficient. It said that more probative evidence would have compared, on the one hand, the number of qualified MBEs in the local labor market with, on the other hand, the number of city contracts awarded to MBEs and the number of MBEs in the local contractors' associations.

---

[20] Lower courts have consistently said that *Croson* requires remedial affirmative action measures to be supported by a "strong basis in evidence" that such action is warranted. *See, e.g., Peightal,* 26 F.3d at 1553; *Concrete Works v. City and County of Denver,* 36 F.3d 1513, 1521 (10th Cir 1994), *cert. denied,* 514 U.S. 1004 (1995); *Donaghy v. City of Omaha,* 933 F.2d 1448, 1458 (8th Cir.), *cert. denied,* 502 U.S. 1059 (1991). Some courts have said that this evidence should rise to the level of prima facie case of discrimination against minorities. *See, e.g., O'Donnell Constr. Co. v. District of Columbia,* 963 F.2d 420, 424 (D.C. Cir. 1992); *Stuart,* 951 F.2d at 450; *Cone Corp. v. Hillsborough County,* 908 F.2d 908, 915 (11th Cir.), *cert denied,* 498 U.S. 983 (1990).

In *Adarand*, Justice O'Connor's opinion noted that "racial discrimination against minority groups in this country is an unfortunate reality," and as an example, it pointed to the "pervasive, systematic, and obstinate discriminatory conduct" that underpinned the court-ordered affirmative action measures that were upheld *in United States v. Paradise*, 480 U.S. 149 (1987). *Adarand*, 515 U.S. at 237 (internal quotations omitted).[21] Her opinion did not say, however, that only overwhelming evidence of the sort at issue in *Paradise* can justify affirmative action. Again, *Croson* indicates that what is required is a "strong basis in evidence" to support the government's conclusion that race-based remedial action is warranted, and that such evidence need only approach a prima facie showing of discrimination against minorities. 488 U.S. at 500. The factual predicate in *Paradise* plainly exceeded a prima facie showing. Post-*Croson* lower court decisions support the conclusion that the requisite factual predicate for race-based remedial action does not have to rise to the level of discrimination in *Paradise*.

The Court in *Croson* left open the question whether a government may introduce statistical evidence showing that the pool of qualified minorities would have been larger "but for" the discrimination that is to be remedied. Post-*Croson* lower court decisions have indicated that such evidence can be probative of discrimination.[22]

*Croson* also did not discuss the weight to be given to anecdotal evidence of discrimination that a government gathers through complaints filed with it by minorities or through testimony in public hearings. Richmond had relied on such evidence as additional support for its MBE plan, but the Court discounted it. Post-*Croson* lower court cases, however, have said that anecdotal evidence can buttress statistical proof of discrimination.[23]

In addition, *Croson* did not discuss which party has the ultimate burden of persuasion as to the constitutionality of an affirmative action program when it is challenged in court. Prior to *Croson*, the Supreme Court had spelled out the following evidentiary rule: while the entity defending a remedial affirmative action measure bears the initial burden of production to show that the measures are supported by "a strong basis in evidence," the "ultimate burden" of proof rests

---

[21] The measures at issue in *Paradise* were intended to remedy discrimination by the Alabama Department of Public Safety, which had not hired a black trooper at any rank for four decades, 480 U.S. at 168 (plurality opinion), and then when blacks finally entered the department, had consistently refused to promote blacks to the upper ranks. *Id.* at 169–71.

[22] *See, e.g., Contractors Ass'n*, 6 F.3d at 1008; *O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 427 (D.C. Cir. 1992); *cf. Associated Gen. Contractors v. Coalition for Econ. Equity*, 950 F.2d 1401, 1415 (9th Cir. 1991) (government had evidence that an "old boy network" in the local construction industry had precluded minority businesses from breaking into the mainstream of "qualified" public contractors), *cert. denied*, 503 U.S. 985 (1992).

[23] *See, e.g., Contractors Ass'n*, 6 F.3d at 1002–03 (while anecdotal evidence of discrimination alone rarely will satisfy the *Croson* requirements, it can place important gloss on statistical evidence of discrimination); *Coral Constr. Co.*, 941 F.2d at 919 ("[t]he combination of convincing anecdotal and statistical evidence is potent;" anecdotal evidence can bring "cold numbers to life"); *Cone Corp.* 908 F.2d at 916 (testimonial evidence adduced by county in developing MBE program, combined with gross statistical disparities in minority participation in public contracting, provided "more than enough evidence on the question of prior discrimination and need for racial classification").

upon those challenging the measure to demonstrate that it is unconstitutional. *Wygant*, 476 U.S. at 277–78 (plurality opinion).[24] Lower courts consistently have said that nothing in *Croson* disturbs this evidentiary rule.[25]

Finally, and perhaps most significantly, *Croson* did not resolve whether a government must have sufficient evidence of discrimination at hand *before* it adopts a racial classification, or whether "post-hoc" evidence of discrimination may be used to justify the classification at a later date — for example, when it is challenged in litigation. The Court did say that governments must "identify [past] discrimination with some specificity before they may use race-conscious relief." 488 U.S. at 504. However, every court of appeals to consider the question has allowed governments to use "post-enactment" evidence to justify affirmative action — that is, evidence that the government did not consider when adopting a race-based remedial measure, but that nevertheless reflects evidence of discrimination providing support for the determination that remedial action was warranted at the time of adoption.[26] Those courts have interpreted *Croson* as requiring that a government have *some* evidence of discrimination prior to embarking on remedial race-conscious action, but not that it marshal all such evidence at that time.[27]

---

[24] *See also Wygant*, 476 U.S. at 293 (O'Connor, J., concurring in part and concurring in the judgment) (when the government "introduces its statistical proof as evidence of its remedial purpose, thereby supplying the court with the means for determining that the [government] had a firm basis for concluding that remedial action was appropriate, it is incumbent upon the [challengers] to prove their case; they continue to bear the ultimate burden of persuading the court that the [government's] evidence did not support an inference of prior discrimination and thus a remedial purpose, or that the plan instituted on the basis of this evidence was not sufficiently 'narrowly tailored' ").

[25] *See, e.g., Concrete Works*, 36 F.3d at 1521–22; *Contractors Ass'n*, 6 F.3d at 1005; *Cone Corp.*, 908 F.2d at 916.

[26] *See Concrete Works*, 36 F.3d at 1521; *Contractors Ass'n*, 6 F.3d at 1004), *Coral Constr. Co.*, 941 F.2d at 920. As the Second Circuit put it when permitting a state government to rely on post-enactment evidence to defend a race-based contracting measure, "[t]he law is plain that the constitutional sufficiency of . . . proffered reasons necessitating an affirmative action plan should be assessed on whatever evidence is presented, whether prior to or subsequent to the program's enactment." *Harrison & Burrowes Bridge Constr. Inc. v. Cuomo*, 981 F.2d 50, 60 (2d Cir. 1992).

[27] *See Concrete Works*, 36 F.3d at 1521 ("Absent any preenactment evidence of discrimination, a municipality would be unable to satisfy *Croson*. However, we do not read *Croson*'s evidentiary requirement as foreclosing the consideration of post-enactment evidence."); *Coral Constr. Co.*, 941 F.2d at 920 (requirement that municipality have "some evidence" of discrimination before engaging in race-conscious action "does not mean that a program will be automatically struck down if the evidence before the municipality at the time of enactment does not completely fulfill both prongs of the strict scrutiny test. Rather, the factual predicate for the program should be evaluated based upon all evidence presented to the district court, whether such evidence was adduced before or after enactment of the [program]."). One court has observed that the "risk of insincerity associated with post-enactment evidence . . . is minimized" where the evidence "consists essentially of an evaluation and re-ordering of [the] pre-enactment evidence" on which a government expressly relied in formulating its program. *Contractors Ass'n*, 6 F.3d at 1004. Application of the post-enactment evidence rule in that case essentially gave the government a period of transition in which to build an evidentiary foundation for an affirmative action program that was adopted before *Croson*, and thus without reference to the *Croson* requirements. In *Coral Construction*, the Ninth Circuit permitted the government to introduce post-enactment evidence to provide further factual support for a program that had been adopted *after Croson*, with the *Croson* standards in mind. *See Coral Constr. Co.*, 941 F.2d at 914–15, 919–20.

## 2. Nonremedial Objectives

Because Richmond defended its MBE program on remedial grounds, the Court in *Croson* did not explicitly address if and when affirmative action may be adopted for "nonremedial" objectives, such as promoting racial diversity and inclusion. The same is true of the majority opinion in *Adarand*, since the program at issue in that case also is said to be remedial. In his *Adarand* dissent, Justice Stevens said that the majority's silence on the question does not foreclose the use of affirmative action to serve nonremedial ends. 515 U.S. at 258 (Stevens, J., dissenting). Thus, in the wake of *Croson* and *Adarand*, there are substantial questions as to whether and in what settings nonremedial objectives can constitute a compelling interest.[28]

To date, there has never been a majority opinion for the Supreme Court that addresses the question. The closest the Court has come in that regard is Justice Powell's separate opinion in *Regents of the Univ. of Calif. v. Bakke*, 438 U.S. 265 (1978), which said that a university has a compelling interest in taking the race of applicants into account in its admissions process in order to foster greater diversity among the student body.[29] According to Justice Powell, this would bring a wider range of perspectives to the campus, and in turn, would contribute to a more robust exchange of ideas — which Justice Powell said was the central mission of higher education and in keeping with the time-honored First Amendment value in academic freedom. *See id.* at 311–14.[30] Since *Bakke*, Justice Stevens has been the most forceful advocate on the Court for nonremedial affirmative action measures. He has consistently argued that affirmative action makes just as much sense when it promotes an interest in creating a more inclusive and diverse society for today and the future, as when it serves an interest in remedying past wrongs. *See Adarand*, 515 U.S. at 257 (Stevens, J., dissenting); *Croson*, 488 U.S. at 511–12 & n.1 (Stevens, J., concurring); Johnson, 480 U.S. at 646–47 (Stevens, J., concurring); *Wygant*, 476 U.S. at 313–15 (Stevens, J., dissenting). As a circuit judge in a case involving an ostensibly remedial affirmative action measure, Justice Ginsburg announced her agreement with Justice Stevens' position "that remedy for past wrong is not the exclusive basis upon which racial classifications may be justified." *O'Donnell Constr. Co.*, 963 F.2d at 429 (Ginsburg, J., concurring) (citing Justice Stevens' concurrence in *Croson*, 488 U.S. at 511).

In *Metro Broadcasting*, the majority relied on *Bakke* and Justice Stevens' vision of affirmative action to uphold FCC affirmative action programs in the licensing of broadcasters on nonremedial grounds; the Court said that diversification of

---

[28] Given the nation's history of discrimination, virtually all affirmative action can be considered remedial in a broad sense. But as *Croson* makes plain, that history, on its own, cannot properly form the basis of a remedial affirmative action measure under strict scrutiny.

[29] Although Justice Powell wrote for himself in *Bakke*, his opinion was the controlling one in the case.

[30] Although it apparently has not been tested to any significant degree in the courts, Justice Powell's thesis may carry over to the selection of university faculty: the greater the racial and ethnic diversity of the professors, the greater the array of perspectives to which the students would be exposed.

ownership of broadcast licenses was a permissible objective of affirmative action because it serves the larger goal of exposing the nation to a greater diversity of perspectives over the nation's radio and television airwaves. 497 U.S. at 567–68. The Court reached that conclusion under intermediate scrutiny, however, and thus did not hold that the governmental interest in seeking diversity in broadcasting is "compelling." *Adarand* did not overrule the result in *Metro Broadcasting* — a point not lost on Justice Stevens. *See Adarand*, 515 U.S. at 258 (Stevens, J., dissenting) ("The majority today overrules *Metro Broad.* only insofar as it" is inconsistent with the holding that federal affirmative action measures are subject to strict scrutiny. "The proposition that fostering diversity may provide a sufficient interest to justify [a racial or ethnic classification] is not inconsistent with the Court's holding today — indeed, the question is not remotely presented in this case . . . .").

On the other hand, portions of Justice O'Connor's opinion in *Croson* and her dissenting opinion in *Metro Broadcasting* appear to cast doubt on the validity of nonremedial affirmative action programs. In one passage in her opinion in *Croson*, Justice O'Connor stated that affirmative action must be "strictly reserved for the remedial setting." 488 U.S. at 493 (plurality opinion). Echoing that theme in her dissenting opinion (joined by Chief Justice Rehnquist and Justices Kennedy and Scalia) in *Metro Broadcasting*, Justice O'Connor urged the adoption of strict scrutiny for federal affirmative action measures, and asserted that under that standard, only one interest has been "recognized" as compelling enough to justify racial classifications: "remedying the effects of racial discrimination." 497 U.S. at 612. Justice Kennedy's separate dissent in *Metro Broadcasting* was also quite dismissive of non-remedial justifications for affirmative action; he criticized the majority opinion for "allow[ing] the use of racial classifications by Congress untied to any goal of addressing the effects of past race discrimination"). *Id.* at 632 (Kennedy, J., dissenting).

Nowhere in her *Croson* and *Metro Broadcasting* opinions did Justice O'Connor expressly disavow Justice Powell's opinion in *Bakke*. Accordingly, lower courts have assumed that Justice O'Connor did not intend to discard *Bakke*.[31] That proposition is supported by Justice O'Connor's own concurring opinion in *Wygant*, in which she expressed approval of Justice Powell's view that fostering racial and ethnic diversity in higher education is a compelling interest. 476 U.S. at 286. Furthermore, in *Wygant*, Justice O'Connor said that there might be governmental

---

[31] *See Winter Park Communications, Inc. v. FCC*, 873 F.2d 347, 353–54 (D.C. Cir. 1989), *aff'd sub. nom. Metro Broad., Inc. v. FCC*, 497 U.S. 547 (1990); *Winter Park*, 873 F.2d at 357 (Williams, J., concurring in part and dissenting in part); *Shurberg Broad., Inc. v. FCC*, 876 F.2d 902, 942 (D.C. Cir. 1989) (Wald, C.J., dissenting), *aff'd sub. nom. Metro Broad., Inc. v. FCC*, 497 U.S. 547 (1990). In *Davis v. Halpern*, 768 F. Supp. 968 (S.D.N.Y. 1991), the court reviewed the law of affirmative action in the wake of *Croson* and *Metro Broadcasting*, and, citing Justice Powell's opinion in *Bakke*, said that a university has a compelling interest in seeking to increase the diversity of its student body. *Id.* at 981. *See also United States v. Board of Educ. Township of Piscataway*, 832 F. Supp. 836, 847–48 (D.N.J. 1993) (under constitutional standards for affirmative action, diversity in higher education is a compelling governmental interest) (citing *Bakke* and *Croson*).

interests other than remedying discrimination and promoting diversity in higher education that might be sufficiently compelling to support affirmative action. *Id.* For example, Justice O'Connor left open the possibility that promoting racial diversity among the faculty at primary and secondary schools could count as a compelling interest. *Id.* at 288 n*. In his *Wygant* dissent, Justice Stevens argued that this is a permissible basis for affirmative action. *Id.* at 313–15 (Stevens, J., dissenting).

On the assumption that *Bakke* remains the law, it is clear that to the extent affirmative action is used to foster racial and ethnic diversity, the government must seek some further objective, beyond the mere achievement of diversity itself.[32] As *Bakke* teaches, in higher education, that asserted goal is the enrichment of the academic experience. And according to the majority in *Metro Broadcasting*, the asserted independent goal that justifies diversifying the owners of broadcast licenses is adding variety to the perspectives that are communicated in radio and television. That same kind of analysis must be applied to efforts to promote racial and ethnic diversity in other settings.

For instance, diversification of the ranks in a law enforcement agency arguably serves vital public safety and operational needs, and thus enhances the agency's ability to carry out its functions effectively. *See Wygant*, 476 U.S. at 314 (Stevens, J., dissenting) ("[I]n law enforcement . . . in a city with a recent history of racial unrest, the superintendent of police might reasonably conclude that an integrated police force could develop a better relationship with the community and thereby do a more effective job of maintaining law and order than a force composed only of whites."); *Paradise*, 480 U.S. at 167 n.18 (plurality opinion) (noting argument that race-conscious hiring can "restore[ ] community trust in the fairness of law enforcement and facilitate[ ] effective police service by encouraging citizen cooperation").[33] It is more difficult to identify any independent goal that may be attained by diversifying the racial mix of public contractors. Justice Stevens concurred in the judgment in *Croson* on precisely that ground. Citing his own *Wygant* dissent, Justice Stevens contrasted the "educational benefits to the entire student body" that he said could be achieved through faculty diversity with the minimal societal benefits (other than remedying past discrimination, a predicate that he said was not supported by the evidence in *Croson*) that would flow from a diversification of the contractors with whom a municipality does business. *See Croson*, 488 U.S. at 512–13 (Stevens, J., concurring in part and concurring in the judgment). Furthermore, the Court has stated that the desire to develop a

---

[32] The Court has consistently rejected "racial balancing" as a goal of affirmative action. *See Croson*, 488 U.S. at 507; *Johnson*, 480 U.S. at 639; *Local 28 Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 475 (1986) (plurality opinion); *Bakke*, 438 U.S. at 307 (opinion of Powell, J.).

[33] *See also Detroit Police Officers' Ass'n v. Young*, 608 F.2d 671, 696 (6th Cir. 1979), *cert. denied*, 452 U.S. 938 (1981) ("The argument that police need more minority officers is not simply that blacks communicate better with blacks or that a police department should cater to the public's desires. Rather, it is that effective crime prevention and solution depend heavily on the public support and cooperation which result only from public respect and confidence in the police.").

growing class of successful minority entrepreneurs to serve as "role models" in the minority community is not, on its own, a valid basis for a racial or ethnic classification. *See Croson*, 488 U.S. at 497 (citing *Wygant*, 476 U.S. at 276 (plurality opinion)); *see also Wygant*, 476 U.S. at 288 n* (O'Connor, J., concurring).

Diversification of the health services profession was one of the stated predicates of the racial and ethnic classifications in the medical school admissions program at issue in *Bakke*. The asserted independent goal was "improving the delivery of health-care services to communities currently underserved." *Bakke*, 438 U.S. at 310. Justice Powell said that "[i]t may be assumed that in some situations a State's interest in facilitating the health care of its citizens is sufficiently compelling to support the use of a suspect classification." *Id.* The problem in *Bakke*, however, was that there was "virtually no evidence" that the preference for minority applicants was "either needed or geared to promote that goal." *Id.*[34]

Assuming that some nonremedial objectives remain a legitimate basis for affirmative action after *Adarand*, there is a question of the nature of the showing that may be necessary to support racial and ethnic classifications that are premised on such objectives. In higher education, the link between the diversity of the student body and the diversity of viewpoints on the campus does not readily lend itself to empirical proof. Justice Powell did not require any such evidence in *Bakke*. He said that the strong First Amendment protection of academic freedom that allows "a university to make its own judgments as to education includes the selection of its student body." *Bakke*, 438 U.S. at 312. A university is thus due some discretion to conclude that a student "with a particular background — whether it be ethnic, geographic, culturally advantaged or disadvantaged — may bring to a professional school of medicine experiences, outlooks, and ideas that enrich the training of its student body and better equip its graduates to render with understanding their vital service to humanity." *Id.* at 314.

It could be said that this thesis is rooted in a racial stereotype, one that presumes that members of racial and ethnic minority groups have a "minority perspective" to convey. As Justice O'Connor stated in *Croson*, a driving force behind strict scrutiny is to ensure that racial and ethnic classifications are not motivated by "stereotype." *Croson*, 488 U.S. at 493 (plurality opinion). There are sound arguments to support the contention that seeking diversity in higher education rests on valid assumptions. The thesis does not presume that all individuals of a particular race or ethnic background think and act alike. Rather, it is premised on what seems to be a common sense proposition that in the aggregate, increasing the diversity of the student body is bound to make a difference in the array of perspectives communicated at a university. *See Metro Broad.*, 497 U.S. at 579 ("The predictive judgment about the overall result of minority entry into broadcasting is not a rigid assumption about how minority owners will behave in every

---

[34] Aside from the proffered justification in *Bakke*, the government may have other reasons for seeking to increase the number of minority health professionals.

case but rather is akin to Justice Powell's conclusion in *Bakke* that greater admission of minorities would contribute, on average, to the robust exchange of ideas.'') (internal quotations omitted). Nonetheless, after *Croson* and *Adarand*, a court might demand some proof of a nexus between the diversification of the student body and the diversity of viewpoints expressed on the campus.[35] Likewise, a court may demand a factual predicate to support the proposition that greater diversity in a law enforcement agency will serve the operational needs of the agency and improve its performance,[36] or that minority health care professionals are more likely to work in medically underserved communities.[37]

## B. *Narrow Tailoring Test*

In addition to advancing a compelling goal, any governmental use of race must also be ''narrowly tailored.'' There appear to be two underlying purposes of the narrow tailoring test: first, to ensure that race-based affirmative action is the product of careful deliberation, not hasty decisionmaking; and, second, to ensure that such action is truly necessary, and that less intrusive, efficacious means to the end are unavailable. As it has been applied by the courts, the factors that typically make up the ''narrow tailoring'' test are as follows: (i) whether the government considered race-neutral alternatives before resorting to race-conscious action; (ii) the scope of the affirmative action program, and whether there is a waiver mechanism that facilitates the narrowing of the program's scope; (iii) the manner in which is used, that is, whether race is a factor in determining eligibility for a program or whether race is just one factor in the decisionmaking process; (iv) the comparison of any numerical target to the number of qualified minorities in the relevant sector or industry; (v) the duration of the program and whether it is subject to periodic review; and (vi) the degree and type of burden caused by the program. In *Adarand*, the Supreme Court referred to its previous affirmative action decisions for guidance on what the narrow tailoring test entails. It specifically mentioned that when the Tenth Circuit reviewed the DOT program at issue in *Adarand* under intermediate scrutiny, it had not addressed race-neutral alternatives or the duration of the program.

Before describing each of the components, three general points about the narrow tailoring test deserve mention. First, it is probably not the case that an affirmative action measure has to satisfy every factor. A strong showing with respect to most of the factors may compensate for a weaker showing with respect to others.

---

[35] Justice Powell cited literature on this subject in support of his opinion in *Bakke. See* 438 U.S. at 312–13 n.48, 315 n.50.

[36] *See Hayes v. North State Law Enforcement Officers Ass'n,* 10 F.3d 207, 215 (4th Cir. 1993) (although the use of racial classifications to foster diversity of police department could be a *constitutionally permissible objective,* city failed to show a link between effective law enforcement and greater diversity in the department's ranks).

[37] *See Bakke,* 438 U.S. at 311 (opinion of Powell, J.) (noting lack of empirical data to support medical school's claim that minority doctors will be more likely to practice in a disadvantaged community).

Second, all of the factors are not relevant in every case. For example, the objective of the program may determine the applicability or weight to be given a factor. The factors may play out differently where a program is nonremedial.

Third, the narrow tailoring test should not necessarily be viewed in isolation from the compelling interest test. To be sure, the inquiries are distinct: as indicated above, the compelling interest inquiry focuses on the ends of an affirmative action measure, whereas the narrow tailoring inquiry focuses on the means. However, as a practical matter, there may be an interplay between the two. There is some hint of this in *Croson*. In several places, the Court said that the weak predicate of discrimination on which Richmond acted could not justify the adoption of a rigid racial quota — which suggests that if Richmond had opted for some more flexible measure the Court might have been less demanding when reviewing the evidence of discrimination. By the same token, the more compelling the interest, perhaps less narrow tailoring is required. For example, in *Sheet Metal Workers*, and *Paradise*, the Supreme Court upheld what on their face appear to be rather rigid classifications to remedy egregious and persistent discrimination.

However, it bears emphasizing that the Supreme Court has never explicitly recognized any trade-off between the compelling interest and narrow tailoring tests. It is also far from clear that the Court in *Croson* would have found that a more flexible MBE program, supported by the generalized evidence of discrimination on which Richmond relied, could withstand strict scrutiny. In addition, the membership of the Court has changed dramatically in the years since *Sheet Metal Workers* and *Paradise*. Both cases were decided by five-four margins, and only one member of the majority (Justice Stevens) remains. And while Justice O'Connor agreed with the majority in *Sheet Metal Workers* and *Paradise* that ample evidence of deeply entrenched discrimination gave rise to a very weighty interest in race-based action, she dissented on the ground that the particular remedies selected were too rigid.

### 1. *Race-Neutral Alternatives*

In *Croson*, the Supreme Court said that the Richmond MBE program was not "narrowly tailored," in part because the city apparently had not considered race-neutral means to increase minority participation in contracting before adopting its race-based measure. The Court reasoned that because minority businesses tend to be smaller and less-established, providing race-neutral financial and technical assistance to small and/or new firms and relaxing bonding requirements might achieve the desired remedial results in public contracting — increasing opportunities for minority businesses. 488 U.S. at 507, 510. Justice Scalia suggested an even more aggressive idea: "adopt a preference for small businesses, or even for new businesses — which would make it easier for those previously excluded by discrimination to enter the field. Such programs may well have a racially dis-

189

proportionate impact, but they are not based on race." *Id.* at 526 (Scalia, J., concurring). As such, they would not be subjected to strict scrutiny.

The Court in *Croson* did not specify the extent to which governments must consider race-neutral measures before resorting to race-conscious action. It would seem that the government need not first exhaust race-neutral alternatives, but only give them serious attention.[38] This principle would comport with the purposes of ensuring that race-based remedies are used only when, after careful consideration, a government has concluded that less intrusive means would not work. It also comports with Justice Powell's view that in the remedial setting, the government need not use the "least restrictive means" where they would not accomplish the desired ends as well. *See Fullilove*, 448 U.S. at 508 (Powell, J., concurring); *see also Wygant*, 476 U.S. at 280 n.6 (plurality opinion of Justice Powell) (narrow tailoring requirement ensures that "less restrictive means" are used when they would promote the objectives of a racial classification "about as well") (internal quotations omitted).[39]

This approach gives the government a measure of discretion in determining whether its objectives could be accomplished through some other avenue. In addition, under this approach, the government may not be obliged to consider race-neutral alternatives every time that it adopts a race-conscious measure in a particular field. In some situations, the government may be permitted to draw upon a previous consideration of race-neutral alternatives that it undertook prior to adopting some earlier race-based measure.[40] In the absence of prior experience, however, a government should consider race-neutral alternatives at the time it adopts a racial or ethnic classification. More fundamentally, even where race-neutral alternatives were considered, a court might second-guess the government if the court believes that an effective race-neutral alternative is readily available and hence should have been tried. *See Metro Broadcasting*, 497 U.S. at 625 (O'Connor, J., dissenting) (FCC affirmative action programs are not narrowly tailored, in part, because "the FCC has never determined that it has any need to resort to racial classifications to achieve its asserted interest, and it has employed race-conscious means before adopting readily available race-neutral, alternative means"); *Paradise*, 480 U.S. at 199–200 (O'Connor, J., dissenting) (district court's race-based remedial order was not narrowly tailored because the court "had available several alternatives" that would have achieved the objectives in a less intrusive manner).[41]

---

[38] *See Coral Constr. Co.*, 941 F.2d at 923 ("[W]hile strict scrutiny requires serious, good faith consideration of race-neutral alternatives, strict scrutiny does not require exhaustion of every such possible alternative.").

[39] *Cf. Billish*, 989 F.2d at 894 (7th Cir.) (en banc) (Posner, J.) (in reviewing affirmative action measures, courts must be "sensitiv[e] to the importance of avoiding racial criteria . . . whenever it is possible to do so, [as] *Croson* requires"), *cert. denied*, 510 U.S. 908 (1993).

[40] *See Contractors Ass'n*, 6 F.3d at 1009 n.18.

[41] *See also Seibels*, 31 F.3d at 1571 (city should have implemented race-neutral alternative of establishing nondiscriminatory selection procedures in police and fire departments instead of adopting race-based procedures; "continued use of discriminatory tests . . . compounded the very evil that [race-based measures] were designed to eliminate"); *Aiken v. City of Memphis*, 37 F.3d 1155, 1164 (6th Cir. 1994) (remanding to lower court, in part, because

## 2. Scope of Program/Administrative Waivers

Justice O'Connor's opinion for the Court in *Croson* criticized the scope of Richmond's thirty percent minority subcontracting requirement, calling it a "rigid numerical quota" that did not permit consideration, through some form of administrative waiver mechanism, of whether particular individuals benefiting from the ordinance had suffered from the effects of the discrimination that the city was seeking to remedy. 488 U.S. at 508. At first blush, this criticism of the Richmond plan may appear to conflict with previous Court decisions, joined by Justice O'Connor, that held that race-based remedial measures need not be limited to persons who were the victims of discrimination. (*See supra* pp. 174–75.) Upon closer reading, however, *Croson* should not be interpreted as introducing a "victims-only" requirement through the narrow tailoring test.[42] The Court's rejection in *Adarand* of Justice Scalia's position that compensation is due only to individuals who have been discriminated against personally provides further confirmation that *Croson* did not impose any such requirement.

The Court's focus in *Croson* on individualized consideration of persons seeking the benefit of a racial classification appears to have been animated by three separate concerns about the scope of the Richmond plan. First, the Court indicated that in order for a remedial affirmative action program to be narrowly tailored, its beneficiaries must be members of groups that were the victims of discrimination. The Court faulted the Richmond plan because it was intended to remedy discrimination against African-American contractors, but included among its beneficiaries Hispanics, Asian-Americans, Native-Americans, Eskimos, and Aleuts — groups for which Richmond had proffered "*absolutely no evidence of past discrimination.*" *Id.* at 506. Therefore, the Court said, even if the Richmond MBE program was " 'narrowly tailored' to compensate African-American contractors for past discrimination, one may legitimately ask why they are forced to share this 'remedial relief' with an Aleut citizen who moves to Richmond tomorrow?" *Id.*[43] Second, the Court said that the Richmond plan was not even narrowly tailored to remedy discrimination against black contractors because "a successful black entrepreneur . . . from anywhere in the country" could reap its benefits.

---

evidence suggested that the city should have used obvious set of race-neutral alternatives before resorting to race-conscious measures).

[42] Most lower courts have not construed *Croson* in that fashion. *See, e.g., Billish*, 962 F.2d at 1292–94, *rev'd on other grounds*, 989 F.2d 890 (7th Cir.) (en banc), *cert. denied*, 510 U.S. 908 (1993); *Coral Constr. Co.*, 941 F.2d at 925–26 n.15; *Cunico v. Pueblo Sch. Dist. No. 60*, 917 F.2d 431, 437 (10th Cir. 1990). *But see Winter Park Communications, Inc.*, 873 F.2d at 367–68 (Williams, J., concurring in part and dissenting in part) (interpreting *Croson* as requiring that racial classifications be limited "to victims of prior discrimination"); *Main Line Paving Co. v. Board of Educ.*, 725 F. Supp. 1349, 1362 (E.D. Pa. 1989) (MBE program not narrowly tailored, in part, because it "containe[d] no provision to identify those who were victims of past discrimination and to limit the program's benefits to them").

[43] *See O'Donnell Constr. Co.*, 963 F.2d at 427 (MBE program was not narrowly tailored because of "random inclusion of racial groups for which there was no evidence of past discrimination").

*Id.* at 508. That is, the geographic scope of the plan was not sufficiently tailored.[44] Third, the Court contrasted the "rigidity" of the Richmond plan with the flexible waiver mechanism in the ten percent minority participation requirement that was upheld in *Fullilove*. As the Court in *Croson* described it, the requirement in *Fullilove* could be waived where a minority business charged a "higher price [that] was not attributable to the effects of past discrimination." *Id. See Fullilove*, 448 U.S. at 488 (plurality opinion). The theory is that where a business is struggling to overcome discrimination, it may not have the capacity to submit a competitive bid. That an effective waiver provision allows for "individualized consideration" of a particular minority contractor's bid does not mean that the contractor has to be a "victim" of a specific instance of discrimination. It does mean that if the contractor is wealthy and has entered the mainstream of contractors in the community, a high bid might not be traceable to the discrimination that a racial or ethnic classification is seeking to redress. Instead, such a bid might reflect an effort to exploit the classification.[45]

### 3. *Manner in Which Race is Used*

The Court's attack on the "rigidity" of the Richmond ordinance also implicates another common refrain in affirmative action jurisprudence: the manner in which race is used is an integral part of the narrow tailoring requirement. The clearest statement of the Court's somewhat mixed messages in this area is that programs that make race or ethnicity a requirement of eligibility for particular positions or benefits are less likely to survive constitutional challenge than programs that merely use race or ethnicity as one factor to be considered under a program open to all races and ethnic groups.[46]

Two types of racial classifications are subject to criticism as being too rigid. First and most obvious is an affirmative action program in which a specific number of positions are set aside for minorities. The prime example is the medical school admissions program that the Court invalidated in *Bakke*. Justice Powell's

---

[44] *Compare Coalition for Econ. Equity*, 950 F.2d at 1418 (MBE program intended to remedy discrimination against minorities in county construction industry was narrowly tailored, in part, because scope of beneficiaries was limited to minorities within the county) *with Podberesky v. Kirwan*, 38 F.3d 147, 159 (4th Cir.) (scholarship program intended to remedy discrimination against African-Americans in Maryland was not narrowly tailored, in part, because African-Americans from outside Maryland were eligible for the program), *cert. denied*, 514 U.S. 1128 (1995).

[45] *See Milwaukee County Pavers Ass'n v. Fiedler*, 922 F.2d 419, 425 (7th Cir.) (noting that administrative waiver mechanism enabled state to exclude from scope of beneficiaries of affirmative action plan in public contracting "two wealthy black football players" who apparently could compete effectively outside the plan), *cert. denied*, 500 U.S. 954 (1991); *Concrete Gen. Inc. v. Washington Suburban Sanitary Comm'n*, 779 F. Supp. 370, 381 (D. Md. 1991) (MBE program not narrowly tailored, in part, because it had "no provision to 'graduate' from the program those contracting firms which have demonstrated the ability to effectively compete with non-MBE's in a competitive bidding process"); *see also Shurberg Broad., Inc. v. FCC*, 876 F.2d at 916 (opinion of Silberman, J.) ("There must be some opportunity to exclude those individuals for whom affirmative action is just another business opportunity.").

[46] The factor that we labeled above as "scope of beneficiaries/administrative waivers" is sometimes considered by courts under the heading of "flexibility," along with a consideration of the manner in which race is used. For the sake of clarity we have divided them into two separate components of the narrow tailoring test.

pivotal opinion in the case turned squarely on the fact that the program reserved sixteen percent of the slots at the medical school for members of racial and ethnic minority groups. Another example of this type of classification is the program upheld in *Fullilove*. It provides that, except where the Secretary of Commerce determines otherwise, at least ten percent of the amount of federal grants for certain public works projects must be expended by grantees to purchase goods or services from minority-owned businesses. 42 U.S.C. § 6705(f)(2).

The second type of classification that is vulnerable to attack on flexibility grounds is a program in which race or ethnicity is the sole or primary factor in determining eligibility. One example is the FCC's "distress sale" program, which allows a broadcaster whose qualifications have been called into question to transfer his or her license prior to an FCC revocation hearing, provided the transferee is a minority-owned business.[47] Another example of affirmative action programs in which race or ethnicity is a requirement of eligibility are college scholarships that are reserved for minorities.[48]

Under both types of classifications, persons not within the designated categories are rendered ineligible for certain benefits or positions.[49] Justice Powell's opinion in *Bakke* rested on the fact that the admissions program at issue was a quota that saved places for minorities solely on the basis of their race.[50] As Justice Powell put it, such a program

> tells applicants who are not Negro, Asian, or Chicano that they are totally excluded from a specific percentage of the seats in an entering class. No matter how strong their qualifications, quantitative and extracurricular, including their own potential for contribution to educational diversity, they are never afforded the chance to compete with applicants from the preferred groups for the special admissions seats.

[47] The distress sale program was upheld under intermediate scrutiny in *Metro Broadcasting*.

[48] There is a plausible distinction between college scholarships that are reserved for minorities and admissions quotas that reserve places at a college for minorities. In *Podberesky v. Kirwan*, 38 F.3d 147 (4th Cir 1994), *cert. denied*, 514 U.S. 1128 (1995), the Fourth Circuit held that a college scholarship program for African Americans was unconstitutional under *Croson*. The Fourth Circuit's decision, however, did not equate the scholarship program with the admissions quota struck down in *Bakke*, and it did not turn on the fact that race was a requirement of eligibility for the program.

[49] The statutes and regulations under which DOT has established the contracting program at issue in *Adarand* are different. Racial and ethnic classifications are used in the form of a presumption that members of minority groups are "socially disadvantaged." However, that presumption is rebuttable, and members of nonminority groups are eligible for the program "on the basis of clear and convincing evidence" that they are socially disadvantaged. *Adarand*, 515 U.S. at 207. *See id.* at 259–61 (Stevens, J., dissenting) (arguing that the relevant statutes and regulations in *Adarand* are better tailored than the *Fullilove* legislation, because they "do[ ] not make race the sole criterion of eligibility for participation in the program." Members of racial and ethnic are presumed to be disadvantaged, but the presumption is rebuttable, and even if it does not get the presumption, "a small business may qualify [for the program] by showing that it is both socially and economically disadvantaged").

[50] *Bakke* is the only Supreme Court affirmative action case that ultimately turned on the "quota" issue. In *Croson*, the Court referred disparagingly to the thirty percent minority subcontracting requirement at issue in the case as a "quota," but that was not in itself the basis for the Court's decision.

438 U.S. at 319. Justice Powell contrasted admissions programs that require decisions based *"solely"* on race and ethnicity, *id.* at 315, with programs in which race or ethnic background is simply one factor among many in the admissions decision. Justice Powell said that in the latter type of program, "race or ethnic background may be deemed a 'plus' in a particular applicant's file, yet it does not insulate the individual from comparison with all other candidates for the available seats." *Id.* at 317. In Justice Powell's view, such programs are sufficiently flexible to meet the narrow tailoring requirement.

This line of reasoning also resonates in *Johnson v. Transportation Agency*, 480 U.S. 616 (1987). There, the Supreme Court upheld an affirmative action plan under which a state government agency considered the gender of applicants[51] as one factor in making certain promotion decisions. The Court noted that the plan "set[ ] aside no positions for women," but simply established goals for female representation that were not "construed" by the agency as "quotas." *Id.* at 638. The Court further observed that the plan "merely authorize[d] that consideration be given to affirmative action concerns when evaluating qualified applicants." *Id.* The Court stressed that in the promotion decision in question, "sex . . . was but one of numerous factors [that were taken] into account." *Id.* The agency's plan "thus resemble[d]" the type of admissions program "approvingly noted by Justice Powell" in *Bakke*: it "requires women to compete with all other qualified applicants. No persons are automatically excluded from consideration; all are able to have their qualifications weighed against those of other applicants." *Id. See also id.* at 656–57 (O'Connor, J., concurring in judgment) (agency's promotion decision was not made "solely on the basis of sex;" rather, "sex was simply used as a 'plus factor' ").

Finally, *Croson* itself touches on the point. The Court said that in the absence of a waiver mechanism that permitted individualized consideration of persons seeking a share of city contracts pursuant to the requirement that thirty percent of the dollar value of prime contracts go to minority subcontractors, the Richmond plan was "problematic from an equal protection standpoint because [it made] the color of an applicant's skin the sole relevant consideration." 488 U.S. at 508.

### 4. Comparison of Numerical Target to Relevant Market

Where an affirmative action program is justified on remedial grounds, the Court has looked at the size of any numerical goal and its comparison to the relevant labor market or industry. This factor involves choosing the appropriate measure of comparison. In *Croson*, Richmond defended its thirty percent minority subcontracting requirement on the premise that it was halfway between .067 percent— the percentage of city contracts awarded to African-Americans during the years

---

[51] Although *Johnson* was a Title VII gender classification case, its reasoning as to the distinction between quotas and goals is instructive with respect to the constitutional analysis of racial and ethnic classifications.

1978–1983 — and fifty percent — the African-American population of Richmond. The Court in *Croson* demanded a more meaningful statistical comparison and much greater mathematical precision. It held that numerical figures used in a racial preference must bear a relationship to the pool of qualified minorities. Thus, in the Court's view, the thirty percent minority subcontracting requirement was not narrowly tailored, because it was tied to the African-American population of Richmond, and as such, rested on the assumption that minorities will choose a particular trade "in lockstep proportion to their representation in the local population." 488 U.S. at 507.[52]

## 5. *Duration and Periodic Review*

Under *Croson*, affirmative action represents a "temporary" deviation from "the norm of equal treatment of all racial and ethnic groups." *Croson*, 488 U.S. at 510. A particular measure therefore should last only as long as it is needed. *See Fullilove*, 448 U.S. at 513 (Powell, J., concurring). Given this imperative, a racial or ethnic classification is more likely to pass the narrow tailoring test if it has a definite end-date,[53] or is subject to meaningful periodic review that enables the government to ascertain the continued need for the measure. The Supreme Court has said that a set end-date is less important where a program does not establish specific numerical targets for minority participation. *Johnson*, 480 U.S. at 640. However, it remains important for such a program to undergo periodic review. *See id.* at 639–40.

Simply put, a racial or ethnic classification that was justified at the point of its adoption may no longer be required at some future point. If the classification is subject to reexamination from time to time, the government can react to changed circumstances by fine-tuning the classification, or discontinuing it if warranted. *See Fullilove*, 448 U.S. at 489 (plurality opinion); *see also Metro Broadcasting*, 497 U.S. at 594; *Sheet Metal Workers*, 478 U.S. at 478 (plurality opinion); *id.* at 487–88 (Powell, J., concurring).

---

[52] *Compare Aiken*, 37 F.3d at 1165 (remanding to lower court, in part, because race-based promotion goals in consent decree were tied to "undifferentiated" labor force statistics; instructing district court on remand to determine whether racial composition of city labor force "differs materially from that of the qualified labor pool for the positions" in question) *with Edwards v. City of Houston*, 37 F.3d 1097, 1114 (5th Cir. 1994) (race-based promotion goals in city police department were narrowly tailored, in part, because the goals were tied to the number of minorities with the skills for the positions in question), *reh'g granted*, 49 F.3d 1048 (5th Cir. 1995).

[53] *See Paradise*, 480 U.S. at 178 (plurality opinion) (race-based promotion requirement was narrowly tailored, in part, because it was "ephemeral," and would "endure[] only until" non-discriminatory promotion procedures were implemented); *Sheet Metal Workers*, 478 U.S. at 487 (Powell, J., concurring) (race-based hiring goal was narrowly tailored, in part, because it "was not imposed as a permanent requirement, but [was] of limited duration"); *Fullilove*, 448 U.S. at 513 (Powell, J., concurring) (race-based classification in public works legislation was narrowly tailored, in part, because it was "not a permanent part of federal contracting requirements"); *O'Donnell Constr. Co.*, 963 F.2d at 428 (ordinance setting aside a percentage of city contracts for minority businesses was not narrowly tailored, in part, because it contained no "sunset provision" and no "end [was] in sight").

## 6. Burden

Affirmative action necessarily imposes a degree of burden on persons who do not belong to the groups that are favored by a racial or ethnic classification. The Supreme Court has said, however, that some burdens are acceptable, even when visited upon individuals who are not personally responsible for the particular problem that the classification seeks to address. *See Wygant*, 476 U.S. at 280–81 (plurality opinion) ("As part of this Nation's dedication to eradicating racial discrimination, innocent persons may be called upon to bear some of the burden of the remedy."). This was implicitly reaffirmed in *Croson* and *Adarand*: in both cases, the Court "recognize[d] that any individual suffers an injury when he or she is disadvantaged by the government because of his or her race, whatever that race may be,"[54] but declined to hold that the imposition of that burden pursuant to an affirmative action measure is automatically unconstitutional.

In some situations, however, the burden imposed by an affirmative action program may be too high. As a general principle, a racial or ethnic classification crosses that threshold when it "unsettle[s] . . . legitimate, firmly rooted expectation[s],"[55] or imposes the "entire burden . . . on particular individuals."[56] Applying that principle in an employment case where seniority differences between minority and nonminority employees were involved, a plurality of the Court in *Wygant* stated that race-based layoffs may impose a more substantial burden than race-based hiring and promotion goals, because "denial of a future employment opportunity is not as intrusive as loss of an existing job." *Wygant*, 476 U.S. at 282–83; *see also id.* at 294 (White, J., concurring). In a subsequent case, however, Justice Powell warned that "it is too simplistic to conclude that hiring [or other employment] goals withstand constitutional muster whereas layoffs do not . . . . The proper constitutional inquiry focuses on the effect, if any, and the diffuseness of the burden imposed on innocent nonminorities, not on the label applied to the particular employment plan at issue." *Sheet Metal Workers*, 478 U.S. at 488 n.3 (Powell, J., concurring).

In the contracting area, a racial or ethnic classification would upset settled expectations if it impaired an existing contract that had been awarded to a person who is not included in the classification. This apparently occurs rarely, if at all, in the federal government. A more salient inquiry therefore focuses on the scale of the exclusionary effect of a contracting program. For example, in *Fullilove*, Justice Powell thought it salient that the contracting requirement at issue in the case reserved for minorities a very small amount of total funds for construction work in the nation (less than one percent), leaving nonminorities able to compete for the vast remainder. For Justice Powell, this rendered the effect of the program

---

[54] *Adarand*, 515 U.S. at 230 (citing *Croson*).

[55] *Johnson*, 480 U.S. at 638.

[56] *Sheet Metal Workers*, 478 U.S. at 488 (Powell, J., concurring).

"limited and so widely dispersed that its use is consistent with fundamental fairness." *Fullilove*, 448 U.S. at 515. In some instances, conversely, the exclusionary effect of racial classifications in contracting may be considered too large. For example, the lower court in *Croson* held that Richmond's thirty percent minority subcontracting requirement imposed an impermissible burden because it placed nonminorities at a great "competitive disadvantage." *J.A. Croson Co. v. City of Richmond*, 822 F.2d 1355, 1361 (4th Cir. 1987). Similarly, an affirmative action program that effectively shut nonminority firms out of certain markets or particular industries might establish an impermissible burden. For example, the dissenters in *Metro Broadcasting* felt that the FCC's distress sale unduly burdened non-minorities because it "created a specialized market reserved exclusively for minority controlled applicants. There is no more rigid quota than a 100% set-aside . . . . For the would-be purchaser or person who seeks to compete for the station, that opportunity depends entirely upon race or ethnicity." 497 U.S. at 630 (O'Connor, J., dissenting). The dissenters also dismissed the majority's contention that the impact of distress sales on nonminorities was minuscule, given the small number of stations transferred through those means. The dissenters said that "[i]t is no response to a person denied admission at one school, or discharged from one job, solely on the basis of race, that other schools or employers do not discriminate." *Id.*

## C. *The Post-Croson Landscape at the State and Local Level*

*Croson* has not resulted in the end of affirmative action at the state and local level. There is no doubt, however, that *Croson*, in tightening the constitutional parameters, has diminished the incidence of such programs, at least in contracting and procurement. The post-*Croson* experience of governments that continue to operate affirmative action programs in that area is instructive.[57] Many governments reevaluated their MBE programs in light of *Croson*, and modified them to comport with the applicable standards. Typically, the centerpiece of a government's efforts has been a "disparity study," conducted by outside experts, to analyze patterns and practices in the local construction industry. The purpose of a disparity study is to determine whether there is evidence of discrimination against minorities in the local construction industry that would justify the use of remedial racial and ethnic classifications in contracting and procurement. Some studies also address the efficacy of race-neutral alternatives. In addition to obtaining a disparity

---

[57] A comprehensive review of voluntary affirmative action in public employment at the state and local level after *Croson* is beyond the scope of this memorandum. We note that a number of the programs have involved remedial racial and ethnic classifications in connection with hiring and promotion decisions in police and fire departments. Some of the programs have been upheld, and others struck down. *Compare Peightal*, (upholding race-based hiring goal in county fire department under *Croson*) *with Long v. City of Saginaw*, 911 F.2d 1192 (6th Cir. 1990) (striking down race-based hiring goal in city police department under *Croson* and *Wygant*).

study, some governments have held public hearings in which they have received evidence about the workings of the local construction industry.

Post-*Croson* affirmative action programs in contracting and procurement tend to employ flexible numerical goals and/or bidding preferences in which race or ethnicity is a "plus" factor in the allocation decision, rather than a hard set-aside of the sort at issue in *Croson*. It appears that many of the post-*Croson* contracting and procurement programs that rest on disparity studies have not been challenged in court.[58] At least one of the programs was sustained in litigation.[59] Another was struck down as inconsistent with the *Croson* standards.[60] Challenges to other programs were not resolved on summary judgment, and were remanded for further fact finding.[61] Contracting and procurement programs that were not changed after *Croson* have met with a mixed reception in the courts.[62]

### III. *Application of the Croson Standards at the Federal Level*

In essence, *Adarand* federalizes *Croson*, with one important caveat: Congress may be entitled to some deference when it acts on the basis of race or ethnicity to remedy the effects of discrimination. The Court in *Adarand* hinted that at least where a federal affirmative action program is congressionally mandated, the *Croson* standards might apply somewhat more loosely. The Court concluded that it need not resolve whether and to what extent the judiciary should pay special deference to Congress in this area. The Court did, however, cite the opinions of various Justices in *Fullilove*, *Croson*, and *Metro Broadcasting* concerning the significance of Congress' express constitutional power to enforce the antidiscrimi-nation guarantees of the Thirteenth and Fourteenth Amendments — under Section 2 of the former and Section 5 of the latter — and the extent to which courts should defer to exercises of that authority that entail the use of racial and ethnic classifica-tions to remedy discrimination. *See* 515 U.S. at 230–31. Some of those opinions

[58] That has been true in Richmond. It is our understanding that the city conducted a post-*Croson* disparity study and enacted a new MBE program that establishes a bidding preference of "20 points" for prime contractors who pledge to meet a goal of subcontracting sixteen percent of the dollar value of a city contract to MBEs. The program works at the "prequalification" stage, when the city is determining its pool of eligible bidders on a project. Once the pool is selected, the low bidder is awarded the contract.

[59] *See Associated Gen. Contractors v. Coalition for Econ. Equity*, 950 F.2d 1401 (9th Cir. 1991), *cert. denied*, 503 U.S. 985 (1992).

[60] *Associated Gen. Contractors v. City of New Haven*, 791 F. Supp. 941 (D. Conn. 1992), *vacated on mootness grounds*, 41 F.3d 62 (2d Cir. 1994).

[61] *Coral Constr. Co. v. King County*, 941 F.2d 910 (9th Cir. 1991), *cert. denied*, 502 U.S. 1033 (1992); *Concrete Works v. City and County of Denver*, 36 F.3d 1513 (10th Cir. 1994), *cert. denied*, 514 U.S. 1004 (1995). The courts in these two cases commented favorably on aspects of the programs at issue and the disparity studies by which they are justified.

[62] We are aware of at least one such program that survived a motion for summary judgment and apparently is still in effect today. *See Cone Corp. v. Hillsborough County*, 908 F.2d 908 (11th Cir.), *cert. denied*, 498 U.S. 983 (1990). Others have been invalidated. *See, e.g., O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420 (D.C. Cir. 1992); *Contractors' Assoc. v. City of Philadelphia*, 893 F.Supp. 419 (E.D. Pa. 1995); *Arrow Office Supply Co. v. City of Detroit*, 826 F. Supp. 1072 (E.D. Mich. 1993); *F. Buddie Constr. Co. v. City of Elyria*, 773 F. Supp. 1018 (N.D. Ohio 1991); *Main Line Paving Co. v. Board of Educ.*, 725 F. Supp. 1349 (E.D. Pa. 1989).

indicate that even under strict scrutiny, Congress does not have to make findings of discrimination with the same degree of precision as a state or local government, and that Congress may be entitled to some latitude with respect to its selection of the means to the end of remedying discrimination.[63]

In *Fullilove*, Justice Powell's concurring opinion said that, even under strict scrutiny, "[t]he degree of specificity required in the findings of discrimination and the breadth of discretion in the choice of remedies may vary with the nature and authority of a governmental body." *Fullilove*, 448 U.S. at 515 n.14 (Powell, J., concurring). It was therefore of paramount importance to Justice Powell that the racial and ethnic classification in *Fullilove* was prescribed by Congress, which, Justice Powell admonished, "properly may — and indeed must — address directly the problems of discrimination in our society." *Id.* at 499. Justice Powell emphasized that Congress has "the unique constitutional power" to take such action under the enforcement clauses of the Thirteenth and Fourteenth Amendments. *Id.* at 500. *See id.* at 483 (plurality opinion) ("[I]n no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Congress, expressly charged by the Constitution with the competence and authority to enforce equal protection guarantees."). Justice Powell observed that when Congress uses those powers, it can paint with a broad brush, and can devise national remedies for the national problem of racial and ethnic discrimination. *Id.* at 502–03 (Powell, J., concurring). Furthermore, Justice Powell said that through repeated investigation of that problem, Congress has developed familiarity with the nature and effects of discrimination: "After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate when Congress again considers action in that area." *Id.* at 503. Because Congress need not redocument the fact and history of discrimination each time it contemplates adopting a new remedial measure, the findings that supported the *Fullilove* legislation were not

---

[63] Section 1 of the Fourteenth Amendment prohibits states and municipalities from denying persons the equal protection of the laws. Section 5 gives Congress the power to enforce that prohibition. Because Section 1 of the Fourteenth Amendment only applies to states and municipalities, *see United States v. Guest*, 383 U.S. 745, 755 (1966), it is uncertain whether Congress may act under Section 5 of that amendment to remedy discrimination by purely private actors. *See Adarand*, 515 U.S. at 254 n.10 (Stevens, J., dissenting) ("Because Congress has acted with respect to the States in enacting STURAA, we need not revisit today the difficult question of §5's applicability to pure regulation of private individuals."); *Metro Broad.*, 497 U.S. at 605 (O'Connor, J., dissenting) ("Section 5 empowers Congress to act respecting the States, and of course this case concerns only the administration of federal programs by federal officials."). Nevertheless, remedial legislation adopted under Section 5 of the Fourteenth Amendment does not necessarily have to act on the states directly. Indeed, when Congress seeks to remedy discrimination by private parties, it may be indirectly remedying discrimination of the states; for in some cases, private discrimination was tolerated or expressly sanctioned by the states. Private discrimination, moreover, often can be remedied under the enforcement provisions of the Thirteenth Amendment. Section 1 of that amendment prohibits slavery and involuntary servitude. Section 2 gives Congress the power to enforce that prohibition by passing remedial legislation designed to eliminate "the badges and incidents of slavery in the United States." *Jones v. Alfred Mayer Co.*, 392 U.S. 409, 439 (1968). The Supreme Court has held that such legislation may be directed at remedying the discrimination of private actors, as well as that of the states. *Id.* at 438. *See also Runyon v. McCrary*, 427 U.S. 160, 179 (1976). In *Fullilove*, the plurality opinion concluded that the Commerce Clause provided an additional source of power under which Congress could adopt race-based legislation intended to remedy the discriminatory conduct of private actors. *See Fullilove*, 448 U.S. at 475 (plurality opinion).

restricted to the actual findings that Congress made when it enacted that measure. Rather, the record included "the information and expertise that Congress acquires in the consideration and enactment of earlier legislation." *Id.* A court reviewing a race-based remedial act of Congress therefore "properly may examine the total contemporary record of congressional action dealing with the problems of racial discrimination against [minorities]." *Id.* Finally, Justice Powell gave similar deference to Congress when it came to applying the narrow tailoring test. He said that in deciding how best to combat discrimination in the country, the "Enforcement Clauses of the Thirteenth and Fourteenth Amendments give Congress a . . . measure of discretion to choose a suitable remedy." *Id.* at 508.

Justice O'Connor's opinion in *Croson* is very much in the same vein. She too commented that Congress possesses "unique remedial powers . . . under § 5 of the Fourteenth Amendment." *Croson*, 488 U.S. at 488 (plurality opinion) (citing *Fullilove*, 448 U.S. at 483 (plurality opinion)). By contrast, state and local governments have "no specific constitutional mandate to enforce the dictates of the Fourteenth Amendment," but rather are subject to its "explicit constraints." *Id.* at 490 (plurality opinion). Therefore, in Justice O'Connor's view, state and local governments "must identify discrimination, public or private, with some specificity before they may use race-conscious relief." *Id.* at 504. Congress, on the other hand, can make, and "has made national findings that there has been societal discrimination in a host of fields." *Id.* It may therefore "identify and redress the effects of society-wide discrimination" through the use of racial and ethnic classifications that would be impermissible if adopted by a state or local government. *Id.* at 490 (plurality opinion).[64] Justice O'Connor cited her *Croson* opinion and reiterated these general points about the powers of Congress in her *Metro Broadcasting* dissent. *See* 497 U.S. at 605 (O'Connor, J., dissenting) ("Congress has considerable latitude, presenting special concerns for judicial review, when it exercises its unique remedial powers . . . under § 5 of the Fourteenth Amendment.") (internal quotations omitted).

It would be imprudent, however, to read too much into Justice Powell's opinion in *Fullilove* and Justice O'Connor's opinion in *Croson*. They do not, for example, support the proposition that Congress may simply assert that because there has been general societal discrimination in this country, legislative classifications based on race or ethnicity are a necessary remedy. The more probable construction of those opinions is that Congress must have some particularized evidence about the existence and effects of discrimination in the sectors and industries for which it prescribes racial or ethnic classifications. For example, Congress established the *Fullilove* racial and ethnic classification to remedy what the Court saw as the well-documented effects of discrimination in one industry — construction —

---

[64] Justices Kennedy and Scalia declined to join that part of Justice O'Connor's opinion in *Croson* that drew a distinction between the respective powers of Congress and state or local governments in the area of affirmative action.

that had hindered the ability of minorities to gain access to public contracting opportunities. *See Fullilove*, 448 U.S. at 505–06 (Powell, J., concurring); *see also id.* at 473 (plurality opinion).

Based on this reading of *Croson* and *Fullilove*, the endorsement in *Adarand* of strict scrutiny of federal affirmative action programs does not mean that Congress must find discrimination in every jurisdiction or industry affected by such a measure (although it is unclear whether, as a matter of narrow tailoring, the scope of a classification should be narrowed to exclude regions and trades that have not been affected by the discrimination that is to be remedied). State and local governments must identify discrimination with some precision within their jurisdictions; Congress's jurisdiction is the nation as a whole. But after *Adarand*, Congress *is* subject to the *Croson* "strong basis in evidence" standard. Under that standard, the general history of racial discrimination in the nation would not be a sufficient predicate for a remedial racial or ethnic classification. In addition, evidence of discrimination in one sector or industry is not always probative of discrimination in other sectors and industries. For example, a history of lending discrimination against minorities arguably cannot serve as a catch-all justification for racial and ethnic classifications benefitting minority-owned firms through the entire economy; application of the narrow tailoring test would suggest that if lending discrimination is the problem being addressed, then the government should tackle it directly.[65]

Furthermore, under the new standard, Congress probably does not have to hold a hearing or draft a report each time it adopts a remedial racial or ethnic classification. But where such a classification rests on a previous law or series of laws, those earlier measures must be supported by sufficient evidence of the effects of discrimination. And if the findings in the older laws are stale, Congress or the pertinent agency may have to demonstrate the continued relevance of those findings; this would satisfy the element of the narrow tailoring test that looks to the duration of classifications and whether they are subject to reevaluation. Where the record is sparse, Congress or the relevant agency may have to develop it. That endeavor may involve the commissioning of disparity studies of the type that state and local governments around the country undertook after *Croson* to demonstrate that remedial racial and ethnic classifications in public contracting are warranted. Together, the myriad state and local studies may provide an important source of evidence supporting the use by the federal government of national remedial measures in certain sectors of the economy.

Whatever deference a court might accord to federal remedial legislation after *Adarand*, it is undecided whether the same degree of deference would be accorded to nonremedial legislation. In *Metro Broadcasting*, the majority gave substantial

---

[65] Patterns and practices of bank lending to minorities, may, however, reflect a significant "secondary effect" of discrimination in particular sectors and industries, *i.e.*, because of that discrimination, minorities cannot accumulate the necessary capital and achieve the community standing necessary to qualify for loans.

deference to congressional judgments regarding the need for diversity in broadcasting and the linkage between the race of a broadcaster and programming output. *Metro Broad.*, 497 U.S. at 566, 572–73, 591 n.43. The dissenters did not do so, precisely because the classifications were nonremedial and hence, in their view, did not implicate Congress' powers under the Enforcement Clauses of the Thirteenth and Fourteenth Amendments. *Id.* at 605, 628–29 (O'Connor, J., dissenting).

Finally, many existing federal affirmative action programs are not specifically mandated by Congress. Courts are unlikely to accord federal agencies acting without a congressional mandate the same degree of deference accorded judgments made by Congress itself. Agencies do not have the "institutional competence" and explicit "constitutional authority" that Congress possesses. *Adarand*, 515 U.S. at 253 (Stevens, J., dissenting).[66] Although some existing agency programs were not expressly mandated in the first instance in legislation, they may nonetheless be viewed by a court as having been mandated by Congress through subsequent congressional action. For example, in *Metro Broadcasting*, the programs at issue were established by the FCC on its own; Congress's role was limited to FCC oversight hearings and the passage of an appropriations rider that precluded the FCC from using any funds to reconsider or cancel its programs. 497 U.S. at 572–79. The majority concluded that this record converted the FCC programs into measures that had been "specifically approved — indeed, mandated by Congress." *Id.* at 563.

Under strict scrutiny, it is uncertain what level of congressional involvement is necessary before a court will review an agency's program with deference. What may be required is evidence that Congress plainly has brought its own judgment to bear on the matter. *Cf. Adarand*, 515 U.S. at 252 (Stevens, J., dissenting) ("An additional reason for giving greater deference to the National Legislature than to a local law-making body is that federal affirmative-action programs represent *the will of our entire Nation's elected representatives* . . . .") (emphasis added); *id.* at 255 (Stevens, J., dissenting) ("*Congressional deliberations* about a matter as important as affirmative action should be accorded far greater deference than those of a State or municipality.") (emphasis added).

## IV. *Conclusion*

*Adarand* makes it necessary to evaluate federal programs that use race or ethnicity as a basis for decisionmaking to determine if they comport with the strict scrutiny standard. No affirmative action program should be suspended prior to

---

[66] *See Milwaukee County Pavers Ass'n*, 710 F. Supp. at 1540 n.3 (noting that for purposes of judicial review of affirmative action measures, there is a distinction between congressionally mandated measures and those that are "independently established" by a federal agency), *aff'd*, 922 F.2d 419 (7th Cir.), *cert. denied*, 500 U.S. 954 (1991); *cf. Bakke*, 438 U.S. at 309 (opinion of Powell, J.) (public universities, like many "isolated segments of our vast governmental structure are not competent to make [findings of national discrimination], at least in the absence of legislative mandates and legislatively determined criteria").

such an evaluation. The information gathered by many agencies in connection with the President's recent review of federal affirmative action programs should prove helpful in this regard. In addition, appended to this memo is a nonexhaustive checklist of questions that provides initial guidance as to what should be considered in that review process. Because the questions are just a guide, no single answer or combination of answers is necessarily dispositive as to the validity of any given program.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*

*Appendix: Questions to Guide Review of Affirmative Action Programs*

## I. *Authority*

Is the use of racial or ethnic criteria as a basis for decisionmaking mandated by legislation? If not mandated, is it expressly authorized by legislation? If there is no express authorization, has there been any indication of congressional approval of an agency's action in the form of appropriations riders or oversight hearings? These questions are important, because Congress may be entitled to some measure of deference when it decides that racial and ethnic classifications are necessary.

If there is no explicit legislative mandate, authorization, or approval, is the program premised on an agency rule or regulation that implements a statute that, on its face, is race-neutral? For example, some statutes require agencies to give preferences to "disadvantaged" individuals, but do not establish a presumption that members of racial groups are disadvantaged. Such a statute is race-neutral. Other statutes, like those at issue in *Adarand*, require agencies to give preferences to "disadvantaged" individuals, but establish a rebuttable presumption that members of racial groups are disadvantaged. Such a statute is race-conscious, because it authorizes agencies to use racial criteria in decisionmaking.

## II. *Purpose*

What is the objective of the program? Is it intended to remedy discrimination, to foster racial diversity in a particular sector or industry, or to achieve some other purpose? Is it possible to discern the purpose from the face, the relevant statute or legislation? If not, does the record underlying the relevant legislation or regulation shed any light on the purpose of the program?

### A. *Factual Predicate: Remedial Programs*

If the program is intended to serve remedial objectives, what is the underlying factual predicate of discrimination? Is the program justified solely by reference to general societal discrimination, general assertions of discrimination in a particular sector or industry, or a statistical underrepresentation of minorities in a sector or industry? Without more, these are impermissible bases for affirmative action. If the discrimination to be remedied is more particularized, then the program may satisfy *Adarand*. In assessing the nature of the factual predicate of discrimination, the following factors should be taken into account:

**1. Source.** Where can the evidence be found? Is it contained in findings set forth in a relevant statute or legislative history (committee reports and

hearings)? Is evidence contained in findings that an agency has made on its own in connection with a rulemaking process or in the promulgation of guidelines? Do the findings expressly or implicitly rest on findings made in connection with a previous, related program (or series of programs)?

**2. Type.** What is the nature of the evidence? Is it statistical or documentary? Are the statistics based on minority underrepresentation in a particular sector or industry compared to the general minority population? Or are the statistics more sophisticated and focused? For example, do they attempt to identify the number of qualified minorities in the sector or industry or seek to explain what that number would look like "but for" the exclusionary effects of discrimination? Does the evidence seek to explain the secondary effects of discrimination — for example, how the inability of minorities to break into certain industries due to historic practices of exclusion has hindered their ability to acquire the requisite capital and financing? Similarly, where health and education programs are at issue, is there evidence on how discrimination has hampered minority opportunity in those fields, or is the evidence simply based on generalized claims of societal discrimination? In addition to any statistical and documentary evidence, is there testimonial or anecdotal evidence of discrimination in the record underlying the program — for example, accounts of the experiences of minorities and nonminorities in a particular field or industry?

**3. Scope.** Are the findings purported to be national in character and dimension? Or do they reflect evidence of discrimination in certain regions or geographical areas?

**4. "Authorship".** If Congress or an agency relied on reports and testimony of others in making findings, who is the "author" of that information? The Census Bureau? The General Accounting Office? Business and trade associations? Academic experts? Economists? (There is no necessary hierarchy in assessing authorship, but the identity of the author may affect the credibility of the findings.)

**5. Timing.** Since the adoption of the program, have additional findings of discrimination been assembled by Congress or the agency that could serve to justify the need for the program when it was adopted? If not, can such evidence be readily assembled now? These questions go to whether "post-enactment" evidence can be marshaled to support the conclusion that remedial action was warranted when the program was first adopted.

### B. *Factual Predicate: Nonremedial Programs*

*Adarand* does not directly address whether and to what extent nonremedial objectives for affirmative action may constitute a compelling governmental

205

interest. At a minimum, to the extent that an agency administers a nonremedial program intended to promote diversity, the factual predicate must show that greater diversity would foster some larger societal goal beyond diversity for diversity's sake. The level and precision of empirical evidence supporting that nexus may vary, depending on the nature and purpose of a nonremedial program. For a nonremedial program, the source, type, scope, authorship, and timing of underlying findings should be assessed, just as for remedial programs.

## III. *Narrow Tailoring*

### A. *Race-Neutral Alternatives*

Did Congress or the agency consider race-neutral means to achieve the ends of the program at the time it was adopted? Race-neutral alternatives might include preferences based on wealth, income, education, family, geography. In the commercial setting, another such alternative is a preference for new, emerging businesses. Were any of these alternatives actually tried and exhausted? What was the nature and extent of the deliberation over any race-neutral alternatives — for example, congressional debate? agency rulemaking? Was there a judgment that race-neutral alternatives would not be as efficacious as race-conscious measures? Did Congress or the agency rely on previous consideration and rejection of race-neutral alternatives in connection with a prior, related race-conscious measure (or series of measures)?

### B. *Continued Need*

How long has the program been in existence? Even if there was a compelling justification at the time of adoption, that may not be the case today. Thus, an agency must determine whether there is a continued need for the program. In that regard, does the program have an end date? Has the end date been moved back? Is the program subject to periodic oversight? What is the nature of that oversight — does Congress play a role through hearings/reports, or does the agency conduct the review or oversight on its own? Has the program ever been adjusted or modified in light of a periodic review? What were the results of the most recent review and oversight conducted by either Congress or the agency? Is there evidence of what might result if the racial classification were discontinued? For example, is there evidence of the current level of minority participation in government contracting where racial criteria are not used (which may speak to whether discrimination can be remedied without a preference)?

## C. *Pool of Beneficiaries*

Are the benefits of the program spread relatively equally among minority individuals or businesses? Is there information on whether the same individuals or businesses tend to reap most of the benefits, and if so, whether those beneficiaries have overcome discrimination? If the program is intended to remedy discrimination against minorities, does it include among its beneficiaries subgroups that may not have been discriminated against? Is there a procedure for tailoring the pool of beneficiaries to exclude such subgroups? Is there a mechanism for evaluating whether the program is needed for segments within a larger industry that have been the locus of discrimination?

## D. *Manner in Which Race is Used*

Does the program establish fixed numerical set-asides? Is race an explicit requirement of eligibility for the program? If there is no such facial requirement, does the program operate that way in practice? Or is race just one of several factors — a "plus" — used in decisionmaking? Could the objectives of a program that uses race as a requirement for eligibility be achieved through a more flexible use of race?

## E. *Burden*

What is the nature of the burden imposed on persons who are not included in the racial or ethnic classification that the program establishes? Does the program displace those persons from existing positions/contracts? Does it upset any settled expectations that they have? Even if that is not the case, the burden may be impermissible where the exclusionary impact is too great. What is the exclusionary impact in terms of size and dimension? What is the dollar value of the contracts/grants/positions in question? Does the exclusionary impact of the program fall upon a particular group or class of individuals or sectors, or is it more diffuse? What is the extent of other opportunities outside the program? Are persons who are not eligible for the preference put at a significant competitive disadvantage as a result of the program?